## Merchants Service Corporation, Appellee, v. Libby, McNeill & Libby, Appellant.

### Gen. No. 41,514.

Heard in the second division of this court for the first district at the October term, 1940.

Opinion filed March 24, 1942.

WILLIAM H. LONG and LYNDLE W. HESS, both of Chicago, for appellant.

HOPKINS, SUTTER, HALLS & DEWOLFE, of Chicago, for appellee; PETER L. WENTZ and T. EUGENE FOSTER, both of Chicago, of counsel.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This action was brought by plaintiff, Merchants Service Corporation, to recover certain brokerage commissions alleged to be due it from defendant, Libby, McNeill & Libby. The court having sustained plaintiff's motion to strike defendant's defense to plaintiff's statement of claim, defendant elected to abide by its defense and judgment was entered in favor of plaintiff and against defendant for $1,085.10. Defendant appeals.

Plaintiff's statement of claim, after alleging that it was engaged in the general mercantile brokerage business and that ''it is now engaged in winding up its affairs,'' averred:

''2. Prior to June 16, 1936, defendant agreed from time to time with plaintiff to pay the brokerage commissions to plaintiff on all goods, wares and merchandise of the defendant sold or caused to be sold to purchasers by or through plaintiff as broker, at rates

of commission varying from 2% to 5% based on the net sales price of said goods, wares and merchandise after allowance of the usual discount for cash payments, and the plaintiff pursuant thereto at various times from May 28, 1935, to June 15, 1936, both inclusive, sold or caused to be sold by or through it as broker, to divers and sundry purchasers, goods, wares and merchandise of the defendant and thereby there became due and payable from the defendant to the plaintiff brokerage commissions in the amount of $1,058.10, more particularly set forth as follows:'' (Here follows a list of alleged contracts of sale negotiated by plaintiff with defendant from May 28, 1935, to June 15, 1936.)

Defendant's statement of defense, after admitting in paragraph 1 thereof that plaintiff was ''engaged in the general mercantile brokerage business,'' alleged:

''2. The defendant denies that it at any time employed plaintiff as broker or agreed to pay brokerage or commissions on goods, wares, or merchandise sold or caused to be sold by or through the plaintiff as its broker, denies that the plaintiff ever acted as broker for the defendant or performed any other services for the defendant, and denies that the sales alleged in paragraph numbered 2 of the plaintiff's Statement of Claim were made on the dates therein alleged.

''3. The defendant alleges that it agreed from time to time prior to June 16, 1936, to pay commissions to the plaintiff only on completed sales of goods, wares and merchandise of defendant purchased through the plaintiff by shareholders or licensees of the plaintiff or to others under contract for buying services by the plaintiff.

''4. The defendant alleges that all purchasers listed in paragraph numbered 2 of the plaintiff's Statement of Claim were, at all times mentioned therein and in this Defense, shareholders or licensees of the plaintiff, or under contract for buying services by the plaintiff,

and that in all purchases listed in said paragraph the plaintiff was the agent, representative, or intermediary of and acting for and in behalf of the purchasers and not the defendant.

"5. The defendant is informed and believes and therefore alleges that at all times herein mentioned the plaintiff was under agreement with the purchasers listed in paragraph numbered 2 of the plaintiff's Statement of Claim to pay to the respective purchasers any and all commissions paid by the defendant to the plaintiff with respect to the purchases listed in said paragraph.

"6. The defendant alleges that all the goods, wares and merchandise involved in the purchases listed in paragraph numbered 2 of the plaintiff's Statement of Claim were sold and delivered in interstate commerce subsequent to June 19, 1936, to-wit, on the dates more particularly set forth as follows:" (Here follows list showing dates on which the merchandise was actually sold and delivered by defendant to the various purchasers, said dates being from June 22, 1936, to September 30, 1936.) "and that the dates specified by the plaintiff in its Statement of Claim are dates on which contracts to sell were entered into with the respective purchasers, and not dates on which completed sales were made.

"7. The defendant alleges that by virtue of an Act of Congress entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes,' commonly known as the Robinson-Patman Price Discrimination Act (15 U.S.C.A. sec. 13) effective June 19, 1936, the payment of commissions on the purchases listed in paragraph numbered 2 of the plaintiff's Statement of Claim, either to the plaintiff or to the purchasers, is unlawful, illegal, and prohibited by law."

That portion of the Robinson-Patman Price Discrimination Act applicable to this proceeding is sub-

section (c) of section 13 (15 U.S.C.A.). This act became effective June 19, 1936, and the pertinent paragraph thereof reads as follows:

"(c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance of discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

Defendant's theory as stated in its brief is that "in this case we are dealing with price discounts or commissions in lieu of brokerage and not with true brokerage; that whenever commissions are paid to an agent to be turned over to the buyers we are dealing with price discounts and not brokerage; that the Robinson-Patman Price Discrimination Act clearly by its terms prohibits payment of commissions of this type on sales completed after the effective date of the Act; that so applying the Act does not give it a forbidden, retroactive effect merely because the executory contracts to sell happen to have been made before the effective date; and that Congress under the Constitution has the power to prohibit the giving of such allowances in sales in interstate commerce completed after the effective date of the Act, as Congress obviously intended to do, notwithstanding that such prohibition thereby affects the validity or enforcibility of executory contracts made before the enactment and valid when made."

Plaintiff's theory is that "the agreement to pay the brokerage commissions here involved was legal

and valid when made, and plaintiff had earned broker-age commissions under said agreement prior to the effective date of the Robinson-Patman Act''; that ''it will be presumed that the parties do not intend to violate the Robinson-Patman Act''; that ''the Robinson-Patman Act does not by its terms apply under the circumstances of the instant case''; that ''the Robinson-Patman Act will not be construed to operate retroactively to deprive the plaintiff of commissions earned prior to the effective date of that Act''; that ''the Robinson-Patman Act will be construed so as to avoid the question as to whether the Act is constitutional as applied to the facts in the instant case''; and that ''to construe the Robinson-Patman Act to deprive the plaintiff of the rights of commissions earned prior to the effective date of that Act would be to deprive the plaintiff of property without due process of law, in violation of the Fifth Amendment to the Constitution of the United States.''

Plaintiff's motion to strike admitted the truth of all the well-pleaded allegations of fact in the verified statement of defense. Therefore we have admitted of record the allegations of defendant's statement of defense that it had not agreed to pay plaintiff broker-age; that it had agreed to pay commissions only on completed transactions; and that these commissions were in fact mere price discounts to be paid plaintiff as the agent for the purchasers and in their behalf.

Just what is the situation presented? Plaintiff is not an independent broker since, having rendered no services to defendant, it does not come within that category. Plaintiff negotiated the contracts with defendant whereby the latter agreed to sell merchandise to purchasers for whom plaintiff was acting as the agent or intermediary and to whom any commissions payable to plaintiff as the result of the completed sales would accrue as price discounts. All of the contracts to sell in question were to be consummated by the

delivery of the merchandise to the purchasers and payment therefor. Commissions were payable to plaintiff only after the merchandise was delivered and paid for. All of said contracts to sell were valid when made and they were all made prior to June 19, 1936, the effective date of the Robinson-Patman Act. However, none of the sales were completed until after the effective date of said act. The commissions claimed herein were not "earned" until the sales were completed, which was, as already stated, after the effective date of the Robinson-Patman Act.

The principal question presented for determination is whether the prohibition contained in the Robinson-Patman Act applies to purchasers' price discounts where the sales contracts were initiated before and the sales completed after the effective date of the act.

The very purpose of the aforesaid act was to prevent and prohibit the seller from giving the purchaser discriminatory price discounts such as were provided for under the several contracts to sell entered into between plaintiff and defendant. We think that it must be conceded that the purchasers themselves for whose benefit these contracts were made and who were to receive the price discounts would be precluded from recovering the amount of such price discounts since the act intervened between the respective dates of the contracts to sell and the dates of the completed sales and absolutely prohibited the payment to purchasers of any discriminatory allowances. That being so, is plaintiff in any better position to recover the amount of the price discounts than the actual purchasers? We think not. It was merely acting as their agent and certainly had no more right to the price discounts than they had after the prohibition became effective. In *Great A. & P. Tea Co. v. Federal Trade Commission*, 106 F. (2d) 667, while the question involved therein was the propriety of a cease and desist order issued by the Federal Trade Commission, the court inter-

preted subsection (c) of the Robinson-Patman Act in a manner peculiarly applicable to the situation presented here. There it was said at pages 674, 675:

"At each stage of its enactment, paragraph (c) was declared to be an absolute prohibition of the payment of brokerage to buyers or buyers' representatives or agents. . . .

". . . We entertain no doubt that it was the intention of Congress to prevent dual representation by agents purporting to deal on behalf of both buyer and seller. . . . The phrase 'except for services rendered' is employed by Congress to indicate that if there be compensation to an agent, it must be for bona fide brokerage, viz., for actual services rendered to his principal by the agent. . . . In short, a buying and selling service cannot be combined in one person." (To the same effect are *Biddle Purchasing Co. v. Federal Trade Commission*, 96 F. (2d) 687; *Oliver Bros., Inc. v. Federal Trade Commission*, 102 F. (2d) 763; and *Webb-Crawford Co. v. Federal Trade Commission*, 109 F. (2d) 268.)

Is there any language in subsection (c) of the act heretofore set forth which indicates that it does not apply when the contract to sell was entered into before the effective date of the act? No such exception can be found therein. The statute plainly states that it shall be unlawful in the course of interstate commerce "to pay . . . brokerage, or . . . any allowance of discount in lieu thereof . . . in connection with the sale . . . to the buyer's agent or intermediary."

It will be noted that the prohibition in the Robinson-Patman Act applied to price discounts in connection with *sales* and that all the actual sales made herein occurred after the effective date of said act. If Congress intended to except from the prohibition of the act payments and sales occurring subsequent to its effective date but arising from pre-existing contracts to sell it undoubtedly would have said so. That Congress did

not so intend and that it intended that the statute under consideration was to take effect literally without the exemption of existing contracts to sell from its prohibition is indicated by the following excerpt from the debate in the United States Senate, after submission of conference report, reported at 80 Congressional Record 9903 (June 18, 1936):

"Mr. Vandenberg. Is any period of grace permitted for existing contracts which would fall under the proposed inhibitions, but which would necessarily have to be completed? Mr. Van Nuys. I think not. Mr. Vandenberg. There is no period of grace? Mr. Van Nuys. There is no period of grace."

The contracts to sell in this case were not made in interstate commerce but the actual sales were. The evident purpose of the enactment in question was to put a stop immediately the act became effective to the payment of commissions or price discounts such as are involved here because they were detrimental to the free flow of interstate commerce.

We are impelled to hold that subsection (c) of the Robinson-Patman Act must have been intended to apply uniformly to all sales made in interstate commerce after its effective date and that since the actual sales herein were made and the merchandise delivered and paid for by the purchasers after June 19, 1936, when said act became effective, defendant could not pay and plaintiff could not receive or accept the commissions or price discounts for which this action is brought without violating the plain provisions of the Robinson-Patman Act.

The only remaining question we deem it necessary to discuss is whether Congress in the exercise of its powers over interstate commerce can impair the obligations of antecedent valid contracts. Plaintiff claims that it had a vested right in its executory contracts to sell which could not be destroyed by a subsequent act of Congress. The law has been clearly

established in the so-called "gold clause" cases that. Congress in the exercise of its legitimate powers may impair the obligations of contracts. In *Norman v. Baltimore & O. R. Co.*, 265 N. Y. 37, 191 N. E. 726, ·92 A. L. R. 1523, which involved the right of a bondholder to require payment in the gold coin specified in his bond or its then present money equivalent, the court said, at page 40 of the first mentioned report: "It [Congress] also has the power prohibited to the States (U. S. Const. art. I, sec. 10, par. 1), to impair contracts by the exercise of its lawful powers."

The identical question involved in the *Norman* case was also presented for determination in *In re Missouri Pac. R. Co.*, 7 F. Supp. 1. There the court used the following language, at page 7:

". . . The powers of the Congress within the field of permissible legislation cannot be obstructed or nullified, by what Mr. Justice Hughes (now Chief Justice) characterized in the Schubert Case, supra [*Philadelphia, B & W. R. Co. v. Schubert*, 224 U. S. 603, 32 S. Ct. 589, 56 L. Ed. 911], as 'prophetic discernment.' Any other and different conclusion, would be well-nigh abhorrent to both logic and common sense. For, I repeat, one who makes a contract, in a matter within the field of permissive congressional legislation, must be deemed to do so with the knowledge that a subsequent act of the Congress may render void his solemn agreement. This rule and principle, which is not capable of distinction here, runs through the very warp and woof of the Federal Constitution. It has been invoked, and it has served to revoke and abrogate an antecedent contract valid when made, between a lawyer and his client (*Calhoun v. Massie*, 253 U. S. 170, 40 S. Ct. 474, 64 L. Ed. 843); between a railroad and the holder of a free pass, issued antecedently and upon a good consideration (*Louisville & Nashville R. Co. v. Mottley, supra* [219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34

L. R. A. (N. S.) 671]); between an employee and a railway, when, sued under the Employers' Liability Act (45 USCA secs. 51–59), the railway set up an antecedent contract barring the beneficiary in a relief fund from maintaining an action for damages for personal injuries (*Philadelphia B. & W. R. Co. v. Schubert, supra*); between the United States and a bridge company, which constructed a bridge in navigable waters under state legislative sanction, valid when made (*Union Bridge Co. v. United States*, 209 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; *Monongahela Bridge Co. v. United States*, 216 U. S. 177, 30 S. Ct. 356, 54 L. Ed. 435). It is not alone, I repeat, in the fields of interstate commerce, navigable waters, and lawyers' contracts for a fee for the recovery of money and pensions from the government, that the right of the individual to forestall and obstruct the Congress by an antecedent contract is denied. The same principle has repeatedly been applied by the Supreme Court in matters of riparian rights. [Citing cases.]"

Both of the foregoing cases were passed upon by the Supreme Court of the United States. In *Norman v. Baltimore & O. R. Co.*, 294 U. S. 240, 55 Sup. Ct. 407, 79 L. Ed. 885, 95 A. L. R. 1352, that court held, at pages 307, 308, 309 and 310 of the first mentioned report:

"Contracts, however express, cannot fetter the constitutional authority of the Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of the Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them. . . .

"The principle is not limited to the incidental effect of the exercise by the Congress of its constitutional authority. There is no constitutional ground for denying to the Congress the power expressly to prohibit

132

and invalidate contracts although previously made, and valid when made, when they interfere with the carrying out of the policy it is free to adopt.''

There is no question but that the application of the statute to the case at bar deprives plaintiff of the right that would otherwise have accrued to it upon full performance of the executory contracts to sell. But that is the only right it lost, and that Congress in the exercise of its powers to regulate interstate commerce may impair the obligation of contracts is no longer open to question.

Other points have been urged and considered, but in the view we take of this case we deem further discussion unnecessary.

For the reasons stated herein the judgment of the municipal court of Chicago is reversed and judgment is entered here in favor of defendant and against plaintiff.

*Judgment reversed and judgment here in favor of defendant and against plaintiff.*

SCANLAN, P. J., and FRIEND, J., concur.