[Civ. No. 12546. First Dist., Div. One. Mar. 29, 1944.]

BODY-STEFFNER COMPANY (a Corporation), Respondent, v. FLOTILL PRODUCTS, INCORPORATED (a Corporation), Appellant.

Moses Lasky, Brobeck, Phleger & Harrison and Jefferson E. Peyser for Appellant.

Rutherford, Jacobs, Cavalero & Dietrich, Newton Rutherford, D. R. Jacobs, Philip Cavalero and Stephen Dietrich for Respondent.

DOOLING, J. pro tem.—Defendant appeals from a judgment for damages rendered against it for failure to deliver certain canned tomatoes and tomato paste pursuant to six written contracts entered into between plaintiff and defendant. In five of the six contracts a standard form of printed contract of purchase and sale adopted by the Canners League of California and approved by the National-American Wholesale Grocers' Association was used.

By typewritten reference in the body of each of these five contracts an attached multigraphed sheet dealing with certain contingencies that might arise out of the war emergency was made a part of the contract. In the discussion which follows we feel justified in treating this multigraphed sheet as a general amendment of the printed form designed to meet certain unusual trade conditions created by the fact of our country being in a state of war, and hence no different in legal effect than if the provisions of the multigraphed sheet had been printed in the body of a revised printed form. In the two contracts which were earliest in time (dated May 23 and June 3, 1941, respectively) into the printed form in the blank provided for the insertion of the buyer's name were typed the words "B. H. Body, Inc. As Agents" and immediately below following the printed word "Remarks" were typed the words:

"Brokerage 5%
B. H. Body, Inc."

It may be remarked parenthetically that B. H. Body, Inc. and plaintiff, Body-Steffner Company, are admittedly the same corporation.

In the three later contracts for which the printed form was

used the words "As Agents" do not appear after the plaintiff's name but in the body of each contract after a description of the merchandise covered by the contract, and following the word "Terms," among other typewritten provisions the typewritten words "Brokerage 5%" were inserted.

The sixth contract was in letter form addressed to defendant by plaintiff and accepted by defendant by signature at the bottom thereof. It read in part: "We give you herewith prices and terms covering option on 10,000 cases 2½ Standard Tomatoes for delivery to the Government," and recited among its terms "Brokerage—5%."

▆ Plaintiff recovered judgment on the theory that all six contracts were contracts of purchase and sale. Defendant contended that all six contracts were in fact contracts of brokerage or agency. In support of this defense questions were asked both on cross-examination of plaintiff's witnesses and by direct examination of defendant's witnesses and offers of proof were made in an effort to prove that it was the general and accepted usage and custom in the canning trade to use the standard form of purchase and sale contract for both sales and agency contracts; that in the trade this standard form of contract was always construed as a contract of agency and not as one of sale where a provision for brokerage was inserted in such contract; and that the word "brokerage" was always used and construed in the trade as providing compensation for an agent and was never used in the trade in the sense of a discount to a purchaser. Objections were sustained to all of such questions and offers of proof. In sustaining such objections we are convinced that the trial court committed prejudicial error.

▆ It is a rule of practically universal acceptation in common law jurisdictions that however clear and unambiguous the words of a particular contract may appear on its face it is always open to the parties to the contract to prove that by the general and accepted usage of the trade or business in which both parties are engaged and to which the contract applies the words have acquired a meaning different from their ordinary and popular sense. (Civ. Code, sec. 1644; Code Civ. Proc., sec. 1861; Rest., Contracts, sec. 246(a); 2 Williston on Sales, 2d ed., sec. 618, p. 1556; 3 Williston on Contracts, rev. ed., sec. 648, pp. 1871-2, sec. 650, pp. 1874-9; 9 Wigmore on Evidence, 3d ed., sec. 2463, p. 204; 25 C.J.S., Customs and Usages, sec. 24, pp. 111-2;

17 C.J., Id., sec. 61, pp. 498-9; 12 Am.Jur., Contracts, sec. 237, pp. 762-3; note 89 A.L.R. p. 1228, et seq.)

The rule is clearly and simply stated in the Restatement of the Law of Contracts, section 246, Comment on Clause (a) in the following language: ''The rule stated in the Clause is not confined to unfamiliar words or to words often used ambiguously. Familiar words may have different meanings in different places. A usage may show that the meaning of a written contract is different from an apparently clear meaning which the writing would otherwise bear.''

Thus, for example, such an apparently clear expression as ''one thousand'' may be shown by a trade usage to mean more than the number one thousand (*Smith* v. *Wilson*, 3 Barn.&Adol. 728, 110 Eng. Reprint 266) or less than that number (*Soutier* v. *Kellerman*, 18 Mo. 509; *Louisiana Red Cypress Co.* v. *George Gilmore & Co.*, 13 Ga.App. 472 [79 S.E. 379]) or to be estimated in an arbitrary manner without regard to actual number (*Brunold* v. *Glasser*, 23 Misc. 285 [53 N.Y.S. 1021]; *Walker* v. *Syms*, 118 Mich. 183 [76 N.W. 320]), and the word ''white'' may, by similar usage, be shown to include its antithesis black (*Mitchell* v. *Henry* (1880), L.R. 15 Ch.Div. 181).

The whole subject has been so recently and comprehensively treated by our Supreme Court in *Ermolieff* v. *R. K. O. Radio Pictures*, 19 Cal.2d 543 [122 P.2d 3], that we need not discuss at length the many authorities cited by counsel on the subject. The court in that case stated the rule applicable here in a single sentence at page 550: ''Parol evidence is admissible to establish the trade usage, and that is true even though the words are in their ordinary or legal meaning entirely unambiguous, inasmuch as by reason of the usage the words are used by the parties in a different sense.''

■ It is true that the parties by their contract may evidence an intention not to be bound by the usage. But the mere use of language which is prima facie inconsistent with the usage cannot be held to show an intent not to be bound by the usage where the usage gives to that very language a meaning different from that which would normally be ascribed to it. As pointed out in the Ermolieff case at page 551, in distinguishing certain cases holding that usage could not be resorted to where the language of the contract was such as to show that the parties intended that the usage should

not apply: "They did not involve a situation where the evidence was introduced to define a term in the contract."

■ Where two parties engaged in the canned goods trade in the same locality, as here, enter into a contract they are bound by a generally accepted usage of the trade in that locality giving to the terms and language actually used in their contract a particular meaning and legal significance, even though that meaning may be at variance with the normal meaning and interpretation which would be given to that language in the absence of proof of the usage of the trade.

Defendants also offered evidence of the prior dealings and negotiations of the parties, their practical construction of earlier contracts in similar form, and certain writings exchanged between the parties pursuant to which it was claimed that all subsequent contracts, including the six contracts here in issue, were executed. All such evidence was excluded although it was urged repeatedly to the court that such evidence, if admitted, would prove that the parties had agreed and understood that their contracts, including the six here in issue, were to be and were contracts of brokerage or agency and not contracts of sale, and that by their practical construction they had actually so construed their earlier contracts in the same form.

Insofar as the previous writings, pursuant to the terms of which all later contracts were claimed to have been executed, are concerned, if their offer on a second trial is supported by proof that they were intended by the parties to be a part of the contracts here in litigation they would seem to be admissible on the entirely independent ground that when several instruments constitute a single contract all are to be read and considered together. (Civ. Code, sec. 1642; Rest., Contracts, sec. 235(c).) This rule is most frequently applied to writings executed contemporaneously, but it is likewise applicable to agreements executed by the parties at different times if the later document is in fact a part of the same transaction. (17 C.J.S., Contracts, sec. 298, p. 715; *Lynch* v. *Bank of America N. T. & S. Assn.*, 2 Cal.App.2d 214, 223 [37 P.2d 716]; *Hawes* v. *Lux*, 111 Cal.App. 21 [294 P. 1080]; *Burleson* v. *Northwestern M. I. Co.*, 86 Cal. 342 [24 P. 1064].)

■ The more fundamental dispute between the parties is whether the contracts are ambiguous on their face so as to justify the introduction of evidence, apart from evidence of

trade usage, to aid in their interpretation. (*Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751 [128 P.2d 665].) In the determination of this question it is to be noted that two of the contracts describe plaintiff "as agent" and all of them provide for "brokerage 5%." "The term 'brokerage' or 'brocage' is commonly used to designate either the commission or compensation paid to a broker for his services, or his business or occupation." (12 C.J.S. 8; 9 C.J. 509.)

These provisions in the five contracts for which the printed form was used were inserted in typewriting, thus calling into play the settled rule that in the construction of a contract "the written parts control the printed parts." (Civ. Code, sec. 1651.)

Despite these facts plaintiff argues, and supports its argument with an array of authorities, that the word "agent" is not always used by contracting parties in its legal sense and the words "brokerage" or "commission" are sometimes used in contracts of sale as the equivalent of "discount." In most of these cases the courts were called upon to construe the contracts in which such words were used without the benefit of extrinsic evidence. It may be conceded that if a court was compelled to construe the contracts here involved on their face and without the aid of extrinsic evidence they would be construed as contracts of sale, despite the typewritten words more appropriate to the relation of principal and agent. It remains true, however, that given their ordinary meaning these terms are inconsistent with the idea of a purchase and sale. (*Hiss* v. *Sutton*, 203 Cal. 459 [264 P. 748]; *De la Questa* v. *Armstrong Holdings Co.*, 48 Cal.App. 487 [192 P. 135]; *Slama Tire Protector Co.* v. *Ritchie*, 31 Cal. App. 555 [161 P. 25]; *Avondale Mills* v. *Benchley Bros.*, 244 Mass. 153 [138 N.E. 586]; *Sutton & Cummins* v. *Kiel Cheese & Butter Co.*, 155 Ky. 465 [159 S.W. 950]; *Clark* v. *Page Oil Co.*, 38 F.Supp. 384; *Cox* v. *Savage*, 209 Mass. 501 [95 N.E. 941].) They are sufficient to cast substantial doubt upon the intention of the parties, and thus to open the door to the introduction of extrinsic evidence to explain their true intention.

▪ Where no extrinsic evidence is offered courts are too frequently compelled to construe ambiguities and to reconcile inconsistencies by a consideration of the contracts on their face; but where extrinsic evidence is offered to explain in-

consistent provisions in a contract courts should not strain to find a clear meaning in an ambiguous document, and having done so exclude the extrinsic evidence on the ground that as so construed no ambiguity exists. ''The true interpretation of every instrument being manifestly that which will make the instrument speak the intention of the party at the time it was made, it has always been considered an exception, or perhaps a corollary, to the general rule above stated, that when any doubt arises upon the true sense and meaning of the words themselves, or any difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and ascertained by evidence *dehors* the instrument itself.'' (*Sandford* v. *Newark etc. R. R. Co.*, 37 N.J.L. 1, 3, as quoted in *Balfour* v. *Fresno C. & I. Co.*, 109 Cal. 221, 225 [41 P. 876], and *Tennant* v. *Wilde*, 98 Cal.App. 437, 445 [277 P. 137].) We need only cite *California C. P. Growers* v. *Williams*, 11 Cal. 2d 221, 229 [78 P.2d 1154], where extrinsic evidence was held proper to explain the words ''renter member'' written on the cover of an otherwise clear and unambiguous contract, and wherein the words as so explained modified and substantially reduced the payments plainly provided to be made by the defendant to the plaintiff in the body of the contract. We can find no substantial difference between the words ''renter member'' placed on the cover of the contract in the Williams case and the words ''as agent'' and ''brokerage 5%'' typed into the body of the contracts here.

Our conclusion that these contracts are ambiguous on their face makes it unnecessary for us to determine in this case whether parol evidence should not be admitted in every case to show the sense in which the parties used the language embodied in their contracts, even though the language used would normally have a clear and settled meaning. There is a considerable body of opinion among students of the subject whose conclusions are entitled to the greatest respect that parol evidence should always be admissible to show the sense in which the contracting parties used and understood the language of their written contracts. (*Cf.* concurring opinion of Traynor, J., in *Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 776 [128 P.2d 665].) Upon this question we need not at this time express any opinion, although the point is presented in the briefs.

These considerations necessitate the reversal of the judgment, but certain other points are raised which should properly be decided for the guidance of the superior court in the retrial of the action. We note them as briefly as we may, giving due consideration to the authorities cited.

Defendant claims that the contracts, if construed as contracts of sale, are illegal under the provision of the Robinson-Patman Act. (15 U.S.C.A., § 13, subd. (c)), which reads:

"(c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

A contract to pay brokerage to a buyer in violation of this section is illegal and unenforceable. (*Jarrett* v. *Pittsburgh Plate Glass Co.*, 131 F.2d 674; *Merchants Service Corp.* v. *Libby, McNeill & Libby*, 314 Ill.App. 121 [40 N.E.2d 835].) The act, however, is only applicable to transactions affecting interstate commerce and plaintiff claims that these contracts which provide for delivery within this state do not fall within its scope. The solution of the question is one depending upon the evidence introduced and the court's findings thereon. A contract, although calling for performance intrastate, may affect interstate commerce so as to fall within the prohibition of this and similar federal legislation. "Where commodities are sold within one state, with the understanding that they are to constitute part of the stream of goods sold in interstate commerce, and this is a typical, constantly recurring course, the current thus existing is a current of commerce among the states, and the prior transaction, though wholly negotiated and executed within a single state, is a part and incident of interstate commerce." (*Fitch* v. *Kentucky-Tennessee Light & Power Co.*, 136 F.2d 12, 17; *American Can Co.* v. *Ladoga Canning Co.*, 44 F.2d 763.)

Defendant claims that it was the settled and almost invari-

able practice under these and earlier similar contracts with plaintiff to deliver the canned goods on plaintiff's order to freight cars for direct shipment to buyers outside of California. The court should allow defendant full opportunity to develop these facts. If the contracts are proved to be subject to this provision of the Robinson-Patman Act that fact will be pertinent in two aspects: 1. In determining the true nature of the contracts under the rule that an interpretation which gives effect to a contract is preferred to one which makes it void (Civ. Code, § 3541; *Robbins* v. *Pacific Eastern Corp.*, 8 Cal.2d 241, 272 [65 P.2d 42]); and 2, in defense of the action on the contracts if they are construed as contracts of sale.

The trial court assessed the damages as of January 5, 1942. The several contracts provided in the typewritten provisions thereof for installment deliveries at different times, but all prior to January 5, 1942. It is defendant's contention that the damages should have been assessed as of the various dates of performance provided in these typewritten provisions.

Plaintiff counters by pointing to certain provisions in the printed part of the contracts providing that goods may be shipped in seller's discretion as soon as practicable after packing and that seller shall have the right to deliver the entire order at one time or in portions from time to time within the time of delivery provided. It argues that under these provisions all of the goods might have been delivered during the month of December, 1941, without violating the terms of the contracts. The typewritten provisions of the several contracts provided specific times and time limits for shipment. For example, the contract of May 23, 1941, contained the typewritten provision "Shipments:—¼ as packed, balance in equal monthly shipments up to and during the month of November, 1941." This clearly fixed in this particular contract the last day of November as the date for completion of the final delivery. The other contracts contained similar typewritten provisions. Under the rule, above adverted to, that typewritten provisions of a contract control the printed provisions where the two are inconsistent, the clear provisions in typewriting fixing definite times for delivery must be held controlling. (*Hooke* v. *Pacific Grape Products Co.*, 18 Cal.App.2d 363 [63 P.2d 837].)

The principal dispute between the parties on this phase of

the case is whether the evidence is sufficient to support a finding that the dates of delivery were effectively postponed by the subsequent conduct of the parties. Since the evidence may be different or fuller on this phase of the case on a retrial we consider it proper to determine only the correct rule of law to be applied in determining on the facts as found whether the dates of delivery were effectively postponed to January 5, 1942.

Defendant claims that, the contracts being in writing, the dates of delivery could only be postponed by a subsequent contract in writing (Civ. Code, § 1698) or by an oral promise by defendant to make later deliveries and plaintiff's action in reliance thereon to its detriment so as to constitute an estoppel against defendant to assert that the breaches occurred on the dates fixed for the several deliveries. Herein defendant argues that such estoppel may only be shown by evidence that in reliance upon defendant's promises of later deliveries plaintiff refrained from going into the market to buy tomatoes of the same amount and quality within a reasonable time after each default. Plaintiff claims on the other hand that the dates of delivery fixed by a written contract may be waived by the oral agreement of the parties, in which event the damages are properly assessed as of the date of actual refusal to deliver.

In *Eskew* v. *California Fruit Exch.*, 203 Cal. 257 [263 P. 804], a case involving a written contract, the Supreme Court said at pages 261-2:

"The next and final contention of appellant is that the court was in error in its admeasurement of damages for the breach of said agreement. This contention is based upon the theory that the contract for the delivery of the grapes was breached as to each carload thereof upon the failure of the defendant to deliver such carload on the date specified in the contract for the delivery thereof, and that this being so the plaintiff's damages should have been reckoned upon the basis of the market price of such grapes upon the date of the breach of each successive delivery and not upon the date when the defendant finally and expressly refused to make delivery of the remaining carloads of said grapes. We are satisfied, however, that under the terms of the contract and the evidence in the case the trial court was correct in its fixation of the date of October 2, 1924, as the time at which the plaintiff's

damages for defendant's breach of its agreement were to be reckoned. Prior to that date and after the defendant's first failure to make delivery, in conferences between the plaintiff and the defendant the latter repeatedly promised to endeavor to fulfil the terms of its agreement, and it was only after the market price of Zinfandel grapes of the required quality had increased to $100 a ton that the defendant finally and on the 2d of October, announced its refusal to further endeavor to comply with the terms of its agreement. This being so, the latter date was properly adopted by the trial court as the date upon which to ascertain the market value of grapes of the required kind and quality for the purpose of admeasuring the plaintiff's damages for the breach of the aforesaid agreement.''

In view of this holding of the Supreme Court it is useless to discuss earlier cases in our District Courts of Appeal or cases from other jurisdictions cited by the parties.

Defendant further points to a letter of November 10, 1941, written by plaintiff's attorneys to defendant in which, while insisting on full delivery under the contracts it was stated that acceptance of any goods "shall not amount to a waiver of any defaults that have already occurred on your part or that may occur in the future." Whether the subsequent conduct of the parties was such as to waive the defaults in delivery and validly extend the time therefor, despite the statement to the contrary in this letter, would appear to be a question of fact the proper solution of which will depend on the proofs educed and the construction thereof by the trial court in the exercise of its sound discretion.

One other question is presented under a provision of the five printed contracts for proration among buyers if the seller is unable to fulfil all of its contracts for certain reasons specified. Whether or not the facts justifying the application of the proration clause are shown to exist will depend upon the proofs. If the facts entitling defendant to the benefit of the proration clause are established, plaintiff's damages will be limited to the amount of merchandise to which it was entitled as its pro rata share. It is no concern of plaintiff whether defendant prorated its deliveries proportionately to all parties holding similar contracts with it. "One of the seller's customers under a contract to make a pro rata delivery in case of shortage has no ground of complaint be-

cause distribution is made in a different proportion among others, unless he is prejudiced thereby.'' (55 C.J. 385; note in 74 A.L.R. pp. 1105-6 and cases cited therein; *Ranney-Davis Mercantile Co.* v. *Shawano Canning Co.*, 111 Kan. 68 [206 P. 337].)

The judgment appealed from is reversed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied April 28, 1944, and respondent's petition for a hearing by the Supreme Court was denied May 25, 1944. Curtis, J., voted for a hearing.