[Civ. No. 24765. Second Dist., Div. Three. Aug. 10, 1961.]

ROBERT E. GOLLAHER, Respondent, v. MIDWOOD CON-STRUCTION COMPANY, INC. (a Corporation), Appellant.

Louis R. Eglash and Jack Lincoln for Appellant.

Gerald H. Gottlieb and Richard Rathbun for Respondent.

FORD, J.—The defendant Midwood Construction Company, Inc., a corporation, has appealed from a judgment in favor of the plaintiff Gollaher for damages for breach of contract.

The plaintiff, doing business under the name of Gollaher Construction Company, and the defendant entered into an agreement which was dated February 25, 1957. That agreement was embodied in a printed form, with appropriate typewritten insertions in the spaces provided therefor, and in a typewritten page added thereto. In that page it was provided in part as follows:

"GOLLAHER CONSTRUCTION COMPANY hereinafter known as the subcontractor agrees to supply all carpentry labor and equipment necessary to completely frame the four models for Tract No. 22848 in Northridge, with the following provisions: This contract covers all rough carpentry labor making house ready for plaster and stucco. . . .

7. If it is decided by Midwood Construction Company to award to the Subcontractor Tract No. 22848 consisting of approximately 277 units, Subcontractor hereby agrees to accept this tract at the above mentioned unit prices [$765 per unit] and this agreement with the understanding also that the production schedule will by [be] 10 units a day in sequence, or as called for by Contractor."

The present action arose out of the refusal of the defendant to permit the plaintiff to do the rough carpentry on units other than the four models. The findings of fact of the trial

court may be summarized as follows: 1. The defendant originally asked the plaintiff to submit a bid for the framing of some 600 houses in Tract Number 22848; later the defendant reduced the number to approximately 277 houses and the plaintiff submitted a bid based on that number. 2. On February 25, 1957, the plaintiff was presented with the form of the agreement and for the first time learned that he was being asked to do work on four models only, on land other than in Tract Number 22848, at the amount bid per unit for approximately 277 houses. 3. When the plaintiff protested the reduction in the number of units, his attention was directed to paragraph 7 of the addendum (the language of which has been set forth hereinabove). 4. The plaintiff was thereupon ''given assurance by the defendant that, notwithstanding the terms of the proposed contract, he would be given the right to construct the balance of the units in Tract No. 22848.'' 5. The parties signed the contract of February 25, 1957; ''[a]ll prior negotiations of the parties by this writing were merged in the terms of this agreement,'' but under the provisions of paragraph 7 of the addendum there was reserved ''the additional factor to be decided subsequent to the execution of the contract as to whether or not plaintiff was to be awarded this additional job.'' 6. *''Thereafter, both orally and by numerous acts and by writings, the defendant did exercise its decision to award to plaintiff Tract No. 22848, consisting of approximately 277 units, at the same rate as he contracted to perform the work, labor, and services on the four models,* and pursuant to this contract as between the parties the plaintiff constructed the four models under the plans and specifications of the defendant, with such modifications thereof as were specifically ordered by the defendant and approved by it, and the four models were, in due time, fully accepted and paid for by the defendant.'' (Emphasis added.) 7. The plaintiff performed preparatory work ''necessary to framing the additional 261 units[1] of houses, including the expenditure of time and money''; at all times ''plaintiff has been and now is ready, able, and willing to perform all other and further conditions and covenants of the said agreement on his part to be performed.'' 8. ''On or about May 7, 1957, and at all times thereafter, without fault upon the

---

[1]As will be hereinafter noted, after February 25, 1957, the defendant determined to build 261 houses in Tract No. 22848 rather than 277 units as previously contemplated.

part of plaintiff, defendant refused and failed to permit plaintiff to continue or complete performance of the said agreement, and on that date defendant repudiated and breached the said agreement, and thereafter proceeded to have the said 261 units of houses framed by another.'' 9. The defendant failed and refused to pay to the plaintiff the contract price of $765 for each of the 261 units. 10. If the plaintiff had been permitted to complete his contract, he would have encountered certain conditions which would have increased his costs per unit; such conditions consisted of a strike in one of the building trades, an increase ''in the cost of certain building trade labor,'' and adverse weather, as well as other matters. 11. Had the plaintiff been permitted to complete his contract, his costs would have been $703.80 per unit, or a total cost of $183,691.80 for 261 units; ''[u]nder the contract plaintiff was entitled to receive $765.00 per unit, or $199,665.00''; ''because of the repudiation and breach of contract by defendant,'' the plaintiff was damaged in the amount of $61.20 per unit, or in the total amount of $15,973.20. Judgment was entered for that amount, together with interest (from a date as to which the parties agreed) and costs.

Placing its reliance on the parol evidence rule, the defendant primarily contends that there was no contract with respect to 261 units upon which a recovery by the plaintiff could be based. Succinctly stated, the question presented is whether there is any support in the record for that part of the findings of fact, emphasized above, that after the execution of the agreement of February 25, 1957, ''both orally and by numerous acts and by writings, the defendant did exercise its decision to award to plaintiff'' the work on the houses other than the four models.

Under paragraph 7 of the typewritten page of the agreement, the defendant was given the privilege or option of having the plaintiff do the framing work on approximately 277 units in Tract Number 22848 for $765 per unit. It is obvious that the defendant could exercise that right only by words spoken or acts done on its behalf *after* the execution of the contract of February 25, 1957. Evidence of such words or acts was not received for the purpose of varying the terms of the contract or changing the rights of the parties for which provision was made therein, but rather for the purpose of showing the exercise by the defendant of its privilege or option in harmony with the terms of the agreement;

upon such exercise the duties and rights of the plaintiff as well as the obligations of the defendant were as set forth in the agreement. Such purpose is obviously consistent with the substantive law embodied in the parol evidence rule.[2]

 We turn then to the question of the sufficiency of the evidence to sustain the findings that the defendant did in fact exercise its privilege or option under the provisions of paragraph 7 and did thereafter breach its obligation, so assumed, that the plaintiff should be allowed to do the designated work and be paid $765 per unit therefor. "In considering this question, we must follow the rule that we are 'bound by the decision of the trial court if there is any substantial evidence' to support the finding and must accept 'the full force of the evidence adduced, together with every inference favorable to the prevailing party that may be drawn therefrom, and excluding all evidence in conflict therewith.'" (*Talizin* v. *Oak Creek Riding Club*, 176 Cal.App.2d 429, at p. 434 [1 Cal.Rptr. 514] ; see also *Estate of Nidever*, 181 Cal. App.2d 367, 370 [5 Cal.Rptr. 343].)

 With respect to the change in the number of units to be built, Jerome Snyder, president of the defendant Midwood Construction Company, Inc., testified in part as follows: "The City notified me on January 17th [1957] that I could develop 277 lots of which 261 were one size and 16 were another size. It was at a later date that we decided that we were not going to build houses on 16 of the lots because they were larger lots. . . . Well, the later date was a business decision that we made and it might have been March or April of '57." The four models were constructed "approximately a half to three-quarters of a mile north of the tract."

---

[2]As clearly stated in *Estate of Gaines,* 15 Cal.2d 255, at pages 264-265 [100 P.2d 1055]: "The parol evidence rule, as is now universally recognized, is not a rule of evidence but is one of substantive law. It does not exclude evidence for any of the reasons ordinarily requiring exclusion, based on the probative value of such evidence or the policy of its admission. The rule as applied to contracts is simply that as a matter of substantive law, a certain act, the act of embodying the complete terms of an agreement in a writing (the 'integration'), *becomes the contract of the parties.* The point then is, not how the agreement is to be proved, because as a matter of law the writing is the agreement. Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself. The rule comes into operation when there is a single and final memorial of the understanding of the parties. When that takes place, prior and contemporaneous negotiations, oral or written, are excluded; or, as it is sometimes said, the written memorial supersedes these prior or contemporaneous negotiations. [Citations.]"

The plaintiff testified that he commenced the framing of the models on March 14, 1957. He completed his work on April 5, 1957. About March 20, 1957, Mr. Knott, an employee of the defendant, called the plaintiff and told him that the defendant required a statement from him as to where he would obtain equipment for the work on the 261 units. He went to the defendant's office and signed a document with respect to that matter on March 21, 1957. On April 8 or 9, Mr. Knott telephoned again; as to that conversation, the plaintiff testified as follows: ''Ken Knott said that prior to starting the 261 units that Midwood Construction requested from me a verification of my Workmen's Compensation insurance and adequate public liability insurance carried by me for them on this particular 261 units.'' The plaintiff said he would send such verification to Mr. Knott. Pursuant to that conversation, the plaintiff called his insurance agent. On April 23, Mr. Knott called him again and said that Mr. Snyder and Mr. Levine (secretary of the defendant corporation) wanted to see him in their office on the next morning. The plaintiff went to that office the next day. As to the conversation which then occurred, he testified: ''The first thing that was stated was by Jerry Snyder when I walked in; that they had changed their minds and they were not going to give me the 261 units as they previously agreed to . . . I asked Jerry Snyder why. He said that they felt that I couldn't produce ten units a day, and that was basically the reason why, and the only reason why they were not going ahead with letting me have the deal—the 261 units, as agreed upon. . . . I told Jerry Snyder I wouldn't have bid the job or built the models, which were about 80 miles from my home, four houses, if I didn't think I could build the ten units per day, as I knew before I ever bid how many a day they wanted. Upon telling him that he and Max Levine left the room for three or four minutes. They came back in and Jerry Snyder told me that they would go ahead and let me build the models—build the houses, the 261 units; . . . So I thanked them, Mr. Levine told me to come back the next morning and sign up the necessary papers and work up the pay schedule; which I did.''

A document entitled ''Addenda to contract dated February 25, 1957'' was signed by Mr. Levine; the plaintiff received it in Mr. Levine's office on April 25, 1957. It was typed by an employee of the defendant. A copy thereof is set forth in the

footnote of this opinion.[3] Mr. Gollaher testified that after his conversation with Mr. Levine concerning the matter embodied in that document, he was told by Mr. Levine "to pick up the necessary plans and lumber lists and other things that were required to build a tract." The plaintiff obtained four sets of plans for the 261 units from Mr. Knott. He then went to the architect's office and obtained "lumber sheets for the 261 units from the lumberman that was there with the architect."

Mr. Gollaher also testified to a conversation, which occurred "[a]pproximately April, 1957," in which Mr. Knott told him that the defendant required that he obtain a performance bond with respect to the 261 units; Mr. Knott recommended a company in Santa Ana and the plaintiff communicated with that company.

On May 7, 1957, the plaintiff received a telegram from the defendant. In that telegram it was said: "IN ACCORDANCE WITH ITEM 7 ADDENDA TO OUR CONTRACT ON MODELS FOR TRACT 22848 YOU ARE HEREBY NOTIFIED OF MIDWOODS DECISION NOT TO AWARD CONTRACT FOR TRACT 22848 CONSISTING OF APPROXIMATELY 277 UNITS TO GALLAHER [sic] CONSTRUCTION Co." The next day Mr. Gollaher had a brief conversation with Max Levine in which he expressed his opinion as to the manner in which he had been treated after he had expended time and money "on the preparation of work for the tract."

The defendant argues that no agreement with respect to 261 units could properly be found to have been in existence because of certain printed language in the agreement of February 25, 1957. That printed wording (with a typewritten insertion noted by the use of italics) is in part as follows: "Sub-contractor agrees to furnish all materials, labor, equipment, transportation, and to do and perform all

---

[3] "ADDENDA TO CONTRACT DATED FEBRUARY 25, 1957

"Draw schedule for Northridge Tract consisting of 261 units will be payable as follows:

"20% when sub floors are complete
"30% when ceiling joist installed
"30% when roof is sheathed
"20% after 2nd inspection

"Except that there shall be deducted from said payments a sum equal to .05% of same, which .05% shall be withheld until the expiration of the lien period.

"April 25, 1957

"S/ Midwood Const.
"S/ Max Levine"

of the work necessary for the complete installation of all *as above* for ten of the residential dwellings and appurtenant garages on the various lots in the above numbered tracts . . . that shall be designated by the Contractor. . . . In addition to the ten residential dwellings and appurtenant garages contracted for hereinabove, it is agreed that the Contractor shall have the right to designate additional residential dwellings and garages to be erected on lots in the above numbered tracts, provided such designation shall be made in units of ten, and Sub-contractor agrees to do and perform the work contracted for hereinabove on such additional units of ten as may be designated by the Contractor under the terms and conditions in this agreement set forth. Failure on the part of the Contractor to designate additional units shall limit the work contracted for to the original ten above specified and such additional units as the Contractor may designate, and the Sub-contractor shall be obligated to do and perform the work above specified on all such lots in the above numbered tracts, from time to time, designated by the Contractor in units of ten." The defendant's contention is without merit. The law applicable to a case where a general printed form is used but adapted to the particular situation by typewritten insertions or additions was stated by this court in *Lawrence Block Co.* v. *Palston,* 123 Cal.App.2d 300, at page 310 [266 P.2d 856], as follows: "Where a contract is partly written and partly printed, the written parts control the printed parts. (Civ. Code, § 1651; Code Civ. Proc., § 1862. See *Body-Steffner Co.* v. *Flotill Products,* 63 Cal.App.2d 555, 561 [147 P.2d 84].) The intention disclosed by the written part prevails over the printed part. (*Burns* v. *Peters,* 5 Cal.2d 619, 623 [55 P.2d 1182].)" In the present case, the typewritten language as to the number of units involved qualifies and dominates the entire agreement. To the extent that such language is inconsistent with, or repugnant to, any printed clauses elsewhere in the agreement, the latter are to be disregarded. (See *Lawrence Block Co.* v. *Palston, supra,* 123 Cal.App.2d 300, 311; *Continental Cas. Co.* v. *Phoenix Constr. Co.,* 46 Cal.2d 423, 431 [296 P.2d 801, 57 A.L.R.2d 914]; *Monson* v. *Fischer,* 118 Cal.App. 503, 513 [5 P.2d 628].)

 The evidence which has been related was clearly sufficient to sustain the determination of the trial court that the defendant exercised its privilege or option expressed in paragraph 7 of the typewritten page of the agreement of February 25, 1957. It thereby bound itself to pay to Mr.

Gollaher $765 per unit for the rough carpentry which he was obligated to do. The defendant breached that agreement. There remain for consideration certain contentions of the defendant with respect to the extent of the damages recoverable because of such breach of contract.

The defendant complains that it cannot be determined from the findings of fact how the trial court arrived at the figure of $703.80 per unit as "the cost to plaintiff." But the trial court was not required to set forth its computations showing by what method the amount of damages awarded was determined. (*Employees' Participating Assn.* v. *Pine,* 91 Cal.App.2d 299, 303 [204 P.2d 965].) The pertinent inquiry is whether there was substantial support in the evidence for the finding as to damages.

Where one party to a contract who has agreed to perform certain work in the construction of a building or buildings is, without fault on his part, prevented from doing so by the other party, the primary measure of damages is the amount of his loss, which may consist of his reasonable outlay of expenditures toward performance as well as the profits which he would have made by performance. (*O'Connell* v. *Main & Tenth Streets Hotel Co.,* 90 Cal. 515, 520 [27 P. 373]; *Connell* v. *Higgins,* 170 Cal. 541, 549 [150 P. 769]; see also *Navarro* v. *Jeffries,* 181 Cal.App.2d 454, 460 [5 Cal. Rptr. 435]; 9 Cal.Jur.2d, Building Contracts, § 23; Restatement, Contracts, § 346, comment g.) The evidence directed to the determination of such damages in the present case will be summarized.

The plaintiff testified as to his estimate of the costs per unit which would be incurred in doing the work; the total of such costs so estimated was $572.93 per unit. In preparation for the work, he expended the sum of $314.24. Clinton R. Perkins, called as an expert witness on behalf of the plaintiff, expressed an opinion that the actual cost of the work per unit "would run $563.25." Trent Meredith testified as an expert witness for the defendant; he stated that the custom in Southern California is to add 10 per cent of the cost as anticipated profit; he further testified as follows: "Q. BY MR. EGLASH: Referring to bidding on the framing of tracts, the size of the Midwood Tract, 261 houses, would that be the usual percentage, the customary percentage? . . . THE WITNESS: The usual or customary percentage, if the subcontractor wanted the job, I would say, would be between 5 and 6 per cent." Carl G. Attman, who was called as an expert witness

by the defendant, testified that in his opinion the cost to frame the 261 houses in 1957 would have been "a little over $700" per unit. He further said that in determining the amount of profit a percentage of "[b]etween 8 and 10 per cent" of cost is used. John Kimbrell, a framing contractor, testified for the defendant; in his opinion it would have cost, as of May, 1957, "in the neighborhood of $720" per unit to frame the houses; from the middle of June through December, 1957, such cost would have been "[a]pproximately between $830 and $840" per unit; he further testified as follows: "Well, normally you base your profit at about 10 per cent, between 8 and 10 per cent; that is, of your field costs, not including overhead, of course. . . . it is the general practice that building contractors work on about 8 or 10 per cent." Evidence was also received with respect to an increase in the wages of carpenters in the middle of June 1957, of the effects of a plumbers' strike, and with respect to the effect of very warm weather on the progress of construction.

The weight to be given to the testimony of the various witnesses on the subject of damages and the inferences to be drawn from such evidence were matters within the province of the trial court. It was not necessary that the court's determination of the cost per unit coincide with a specific figure expressed by a witness in the course of his testimony. (*Cf. Employees' Participating Assn.* v. *Pine, supra,* 91 Cal. App.2d 299, 303; *Stone* v. *Farnell,* 239 F.2d 750, 757.)

A review of the evidence shows that the finding of the trial court as to the amount of the plaintiff's damages was amply justified. This court is not at liberty to interfere with such determination.

Finally, the appellant contends that the trial court erred in failing to make a finding upon the subject of mitigation of damages. In the opening brief of the defendant, it is said: "It was on May 7, 1957, that Midwood sent Gollaher the telegram advising him that he was not awarded the tract. Mr. Gollaher and his entire crew and organization were then released to engage in any work or enterprise that they might desire. The evidence is that Plaintiff did not submit any bids on any work during this period although there was work upon which he could have submitted bids. The result was that during this period he did not work at all." Attention is called to a part of the plaintiff's testimony in his deposition which was as follows: "Q. Can you tell me in your opinion how much of your time would have been required to have

been present at the site of the 261-unit tract if you had done the work? A. I would have been on it approximately 90 to 95 per cent of the time." But immediately thereafter, the plaintiff testified in substance that such attendance would not be due to his doing some of the physical work himself. Our attention is not directed to any provision of the agreement which governs the extent of his own personal time that was to be devoted to the work or to any provision which limited the right of the plaintiff to undertake other work concurrently. It is clear, therefore, that the defendant has a misconception as to the applicability of the doctrine of mitigation of damages to the facts of this case. The rule applicable where there is a breach of a contract for personal services[4] is not pertinent under such facts. ■■■ "This rule does not apply to contracts not requiring all or a great portion of the time of plaintiff, or which do not preclude plaintiff from undertaking and being engaged in the performance contemporaneously of other contracts, or to contracts for the performance of particular acts; . . ." (25 C.J.S., Damages, § 34, p. 506; see also *Payne* v. *Pathe Studios, Inc.,* 6 Cal.App.2d 136, 142 [44 P.2d 598].)

In *Olds* v. *Mapes-Reeves Const. Co.,* 177 Mass. 41 [58 N.E. 478], an action was brought by subcontractors against the general contractor for breach of a contract under which the plaintiffs were to furnish and set up all the marble work in a building. The court said (58 N.E., at page 479) : "But there is this difference between the case of one who is discharged while under a contract to render personal services and a case like the present. In the former case the person discharged, whose personal services come back to him, is bound to dispose of them in a reasonable way, so as to make the damages to the other party not unreasonably large, while, in a case like the present, one deprived of his contract is under no obligation to enter into new contracts with a view to make profits for the other party. In a contract of the kind before the court, personal services are not necessarily included. The labor or supervision may be personally performed by the contractor, or may be furnished through agents or employes. . . . Their agreement was not to render personal services, but only to

---

[4] " ' 'It is a general rule that it is the duty of an employee who has been wrongfully discharged before his term of service has expired, to seek other employment, and thus diminish the damages sustained by him.' " (*Smetherham* v. *Laundry Workers' Union,* 44 Cal.App.2d 131, at p. 139 [111 P.2d 948].)

accomplish a specific result. The plaintiffs were at liberty to leave this work entirely to the care of the hired servants, and to take as many other contracts as they chose elsewhere, and to give their personal time and attention to any occupation that they might choose.'' (See also *Grinnell Co.* v. *Voorhees,* 1 F.2d 693, 695; *Gaffney* v. *Switow,* 211 Ky. 232 [277 S.W. 453, 455]; *Koplin* v. *Faulkner* (Ky.App.), 293 S.W.2d 467, 469; *M & R Contractors & Builders* v. *Michael,* 215 Md. 340 [138 A.2d 350, 358-359]; *Mount Pleasant Stable Co.* v. *Steinberg,* 238 Mass. 567 [131 N.E. 295, 296]; *Sides* v. *Contemporary Homes, Inc.* (Mo.App.), 311 S.W.2d 117, 120; Rest., Contracts, § 346, comment f.) ▮▮▮ Since there was no issue as to mitigation of damages of the nature upon which the defendant bases its argument, there was no necessity of any finding of fact with respect to that matter.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 11, 1961.