[No. 30441. Department Two. April 8, 1948.]

CLARK E. RATHKE *et al.*, *Appellants*, v. YAKIMA VALLEY
GRAPE GROWERS ASSOCIATION *et al.*, *Respondents*.[1]

*Cheney & Hutcheson,* for appellants.

*O. L. Boose* and *Grady & Grady,* for respondent Yakima
Valley Grape Growers Association.

*Barker & Day* and *William J. Walsh, Jr.,* for respondents
Yakima County Processors, Inc., *et al.*

[1]Reported in 192 P. (2d) 349.

JEFFERS, J.—This action was instituted by Clark E. Rathke, doing business as Rathke & Company, and Clarke-Donelson Company, a corporation, against Yakima Valley Grape Growers Association, a corporation, Yakima County Processors, Inc., a corporation, Goebel-Pratt Company, a corporation, and the principal stockholders of the latter two corporations, Randall S. Pratt and G. Franklin Jones, to recover damages for an alleged breach of two contracts and to enforce specific performance of both contracts.

One contract was between Yakima Valley Grape Growers Association, as first party, and Clark E. Rathke, doing business as Rathke & Company, of Seattle, as second party. By the terms of this contract, denominated "Purchase Agreement," first party agreed to purchase from second party all the machinery, equipment, materials, and supplies to be used in producing grape juice or other products at first party's plant at Grandview, Washington, for a period of ten years.

The other contract, called "Sales Agreement," was entered into between Yakima Valley Grape Growers Association, as first party, and Clarke-Donelson Company, as second party; and under its terms first party, for a period of ten years, agreed to sell to second party so much of first party's output of grape juice or other products as second party might from time to time require or order, subject to certain restrictions contained in the contract, among which was the right of the Association to sell fifty per cent of its own output.

Yakima Valley Grape Growers Association (which will be hereinafter referred to as the Association) appeared separately and filed an answer to the amended and supplemental complaint of plaintiffs, wherein it admitted entering into the above contracts, and subsequently entering into other contracts and a lease to Yakima County Processors, Inc., whereby the latter leased the plant of the Association at Grandview and controlled the sale of its output, thereby interfering with plaintiffs' contractual relationship with the Association. Defendant Association denied the other material allegations of the complaint and, by way

of an affirmative defense, pleaded certain acts and conduct on the part of plaintiffs in justification of any alleged breach of such sales and purchase agreements.

The remaining defendants, represented by separate counsel, entered a general denial to the material allegations of the complaint.

The cause came on for trial before the court on December 17, 1946. At the close of the taking of testimony, defendants contended and argued that plaintiffs should not prevail in the action, for three reasons: (1) that the Clarke-Donelson contract (sales agreement) was illegal and void under the provisions of the Robinson-Patman Act, 15 U.S.C.A. 186, § 13, subd. (a), (c), (d), and p. 200, § 13a (49 Stat. 1526 *et seq.*); (2) that the two contracts sued upon were unenforcible under the facts; and (3) that plaintiffs failed to prove any damages or any legal measure or standard by which damages could be determined.

The illegality of the contracts under the Robinson-Patman Act was not pleaded by defendants, but was raised for the first time after the conclusion of the testimony. The trial court concluded that the sales contract sued upon was in violation of the Robinson-Patman Act, and therefore illegal and void; that the purchase agreement was unenforcible, for reasons hereinafter shown; and that an action would not lie to enforce such contracts. The court therefore dismissed the action with prejudice, without deciding any of the other questions presented.

Plaintiffs' motion for judgment notwithstanding the decision or, in the alternative, for a new trial, was denied, and this appeal by plaintiffs followed.

Appellants' assignments of error are that the trial court erred (1) in holding that the Robinson-Patman Act applies to these contracts and this action, and requires dismissal of the action; (2) in failing and refusing to enter judgment in favor of appellants; (3) in entering judgment dismissing the action with prejudice; (4) in denying appellants' motion for judgment notwithstanding the decision; and (5) in denying appellants' motion for a new trial.

If the Clarke-Donelson contract violated the Robinson-Patman Act, rendering that contract illegal, void, and unenforcible, then, in our opinion, the purchase-agreement contract would also be unenforcible, as the two contracts are dependent on each other, and the other questions presented would become immaterial.

In deciding whether or not the trial court was justified in concluding that the Robinson-Patman Act was violated in the instant case, the following factual situation should be considered.

Respondent Association is a Washington corporation, organized in 1934 as a co-operative association of independent grape growers, to act as a marketing agency to sell the growers' grapes in their natural form. The Association has been managed by Homer E. Evans since its inception. In 1938, due to an increased production of grapes, the Association began to realize that there was going to be a surplus of grapes for sale on the fresh grape market, their principal outlet. As long as the grape growers had to depend on the wineries alone to take the bulk of the late surplus grapes, there was a tendency to "ride the price down." The Association perceived that they would have to have some other outlet, such as a grape juice factory, to take the surplus Concords, if they were to maintain the price.

With funds contributed by the members, the Association purchased the Wright Winery, at Grandview, in the summer of 1940. Shortly thereafter, the Association's manager, Mr. Evans, was approached by L. M. Donelson, a machinery and food salesman for Rathke & Company (hereinafter referred to as Rathke Co.).

We think it might be well to here explain the nature of the business of Rathke Co., and its relationship to the Clarke-Donelson Company. Rathke Co., owned solely by Clark E. Rathke, is engaged in the business of selling food processing equipment, machinery, and supplies, and since about 1939 it has engaged in the food brokerage business. At about that time, Rathke Co. had a contract with Pomona Products Company for the sale of cider manufactured by it. Apparently Mr. Donelson was put in charge of the sale

of the cider, on a brokerage basis, and the Clarke-Donelson Company was set up so that Mr. Donelson would have more of a financial interest in his sales. The Clarke-Donelson Company (hereinafter referred to as Donelson Co.) was incorporated on October 9, 1940, with its principal place of business located at Yakima, Washington.

In 1941, Clark E. Rathke was the president and majority stockholder of Donelson Co., the balance of the stock being owned by Donelson, who was manager, and Mrs. Ayers, the office manager of Rathke Co., its secretary. Donelson Co. finances and processes food packs, and sells and acts as broker for the sale of food products.

During his examination, Mr. Rathke was asked the following question:

"Q. Clarke-Donelson Company and Rathke and Company are actually you, aren't they? A. Well, I imagine, to a certain extent."

Shortly after the Association had purchased the Wright Winery at Grandview, in the summer of 1940, Mr. Donelson, as machinery salesman for Rathke Co., approached Mr. Evans and attempted to sell him machinery for the winery. The Association at this time was without working capital, having spent the amount raised by contribution on the purchase of the winery.

After several unsuccessful attempts to sell the Association, Mr. Donelson told Evans about a man named Carl Weisbrod, who had knowledge of a European process for making grape juice at a much cheaper cost than the method ordinarily employed. Donelson introduced Weisbrod to Evans, and Weisbrod explained his process, whereby the grape juice is processed in the regular manner, except that the means by which it is stored for sixty to ninety days to let the cream of tartar settle out is different. Instead of storing the grape juice in expensive five-gallon glass carboys under the orthodox system, Weisbrod claimed it could be stored in large wooden tanks. Weisbrod was confident that his system would work, and he persuaded the Association's board of directors to undertake the manufacture of grape juice by his process. Neither the board nor the

Association's manager, Evans, had the technical knowledge required to make commercial grape juice, so Weisbrod was hired to proceed with the new undertaking. A contract was entered into between Weisbrod and the Association, under which Weisbrod was to install and put into operation the entire grape juice plant.

Weisbrod specified the equipment he needed, and on July 10, 1941, the Association, as first party, and Rathke Co., as second party, entered into the written contract hereinbefore referred to as "Purchase Agreement." This contract provided in part as follows:

"(2) First Party hereby agrees to purchase from Second Party all necessary or required additional machinery and equipment and replacements for its said plant at Grandview, Washington or any other plant, wherever located.

"(3) First Party further agrees to purchase from Second Party, all of the materials and supplies to be used by First Party in the operation of said plant or plants or any extension thereof, for producing grape juice or other products, including but not limited to, labels, crowns, bottles, cans, cartons, sugar, machinery and equipment, and incidental materials and supplies.

"(4) This entire agreement shall be in effect for a period of ten (10) years from the date hereof."

The method by which the purchase of the equipment was to be financed was covered by a written agreement, designated "Machinery Agreement," entered into the same day as the purchase agreement, which, among other things, provided:

"(9) A part of the consideration for the execution of this agreement shall be the execution of an agreement between First and Second Parties, wherein and whereby First Party agrees to purchase all of its machinery, equipment and supplies for the production of grape juice or other products from Second Party, at competitive prices, for a period of ten (10) years.

"It is further agreed that an additional part of the consideration for this agreement is the execution of an agreement between First Party and Clarke-Donelson Company, a Washington corporation, wherein and whereby First Party shall give said Clarke-Donelson Company a *selling agreement* covering their requirements of grape juice and

other products to be produced at First Party's said plant, for a period of ten (10) years." (Italics ours.)

On July 15, 1941, the Association, as first party, and appellant Donelson Co., as second party, entered into the written agreement hereinbefore referred to as "Sales Agreement." This is the agreement referred to in the preceding agreement. It is this sales agreement which respondent contends, and the court held, violated the provisions of the Robinson-Patman Act, and we shall therefore set it out in some detail.

"(1) It is agreed that a part of the consideration for the execution of this agreement is the prior agreement of said Clark E. Rathke to furnish certain machinery and equipment to First Party, under and pursuant to a certain written agreement now existing between the First Party and said Clark E. Rathke.

"(2) First Party agrees that during the life of this contract to-wit: for a period of ten years from the date of this contract, it will sell the Second Party so much of First Party's entire output of grape juice or other products as Second Party may from time to time require or order, subject to following restriction:

"It is understood that First Party will itself endeavor to sell its products under its own name and brand, but it is agreed that First Party will, nevertheless, furnish to Second Party all of the *grape juice or other products that Second Party may order or require,* up to fifty percent of First Party's total season's output or manufacture. It is intended that Second Party shall have the first call upon at least fifty percent of First Party's entire output. It is agreed that First Party shall not be required to furnish to Second Party or upon Second Party's order more than $33\frac{1}{3}\%$ of its total output under a private brand whether the same be Second Party's own brand or a buyer's private brand.

"(3) It is understood that Second Party intends to and will establish its own brand name for such products, and will use its best efforts to develop and establish business in First Party's products. . . .

"(5) It is specifically agreed that when Second Party shall procure a buyer or purchaser, either as broker, wholesaler or jobber for First Party's products, under First Party's or Second Party's brand, then thereafter all such future sales to such buyer shall be subject to the terms of

this agreement, and such buyer shall be considered Second Party's customer as long as Second Party continues to sell such buyer.

"(6) Nothing in this contract contained shall prevent Second Party from making sales under 'buyer's brand,' and in such sales First Party shall bottle or pack as directed by Second Party.

"(7) It is understood that Second Party will be advertising its brand and calling upon customers, and that it will be selling to brokers, wholesalers and others the same as First Party, and that therefore the fixing of prices to Second Party must be adjusted so that Second Party will always be able to sell on the same basis that First Party is able to sell to the trade, including Second Party's discounts or brokerage. Therefore, the price to be paid by Second Party for First Party's grape juice and other products, shall be determined as follows:

"(a) The price to Second Party shall be First Party's established wholesale price at Spokane, Portland or Seattle, less the following per case deductions: (1) A broker's discount of five percent (5%) net to Second Party; (2) Such cash discount as is usually allowed manufacturers, jobbers and brokers; (3) An additional broker's discount of three percent (3%) when an outside broker is employed; (4) An advertising allowance of five percent (5%), (to be increased to First Party's advertising allowance if First Party increases its advertising allowance). In the event that the parties hereto believe it is necessary to stimulate business in a particular area with a particular broker or buyer of Second Party by giving such buyer or broker an additional allowance, then such additional allowance shall be deducted from Second Party's said advertising allowance provided, however, that such deduction shall not be made for a period greater than sixty (60) days in any season.

"(b) In the event that Second Party sells First Party's products under First Party's brand, then Second Party shall be paid the regular broker's commission of five percent (5%) on the wholesale price, which commission shall be net to Second Party, and also an additional brokerage of three percent (3%) if an outside broker is required in the sale. Such sales shall not be charged against Second Party's fifty percent (50%) allotment as provided in paragraph two (2) above.

"(c) In addition to all other discounts or allowances hereinabove provided for, there shall be paid to Second Party by First Party an additional commission of two and

one-half percent (2½%) on all sales made by Second Party during the period from the beginning of this contract until December 31, 1943, if during said period First Party makes sufficient profit from the sale of its grape juice to enable it to pay to the farmers who furnish the grapes the sum of twenty-eight dollars ($28.00) per ton for grapes furnished.

"First Party agrees that it will make its prices so that the same are reasonably competitive with like or similar products and if necessary will adjust its prices so as to meet special circumstances or conditions existing in any particular selling point or area, or strike such area from sales territory of its product. . . .

"(9) This entire agreement shall be in effect for a period of ten (10) years from the date hereof." (Italics ours.)

These contracts were all duly approved by the board of directors of the Association.

It is undisputed that the Association did not have sufficient funds to finance the purchase of the equipment and machinery for the construction of its grape juice plant, and, as stated in the machinery agreement, appellants were interested in selling to respondent Association the needed equipment only upon the condition that an agreement be entered into giving Donelson Co. certain exclusive rights for the sale of the production of the Association's plant.

The machinery and equipment for the plant were purchased by the Association from Rathke Co., pursuant to two written conditional sales contracts. Among this equipment were thirty-four 2500-gallon redwood tanks, selected by Weisbrod. The process advocated by Weisbrod and as employed in Europe used oak tanks for storing the grape juice, but, oak tanks being unavailable at the time, Weisbrod substituted redwood tanks, which he thought would work just as well as the oak tanks.

The machinery was late in arriving, and production was not commenced until October 16, 1941, which is past the middle of the season. Within seventy-two hours after the first seven tanks had been filled with grape juice, the juice had all fermented. Weisbrod attributed this to the fact that the redwood tanks were not airtight, and bacteria thus got into the grape juice, causing it to ferment.

Not having any satisfactory means available for storing the grape juice, the Association sold the fermented juice to a winery and closed the plant for the balance of the 1941 season. As a result of the failure of this venture, the Association was placed in a very embarrassing financial condition. In November, 1941, Rathke Co. commenced suit for the unpaid purchase price of the machinery, which it declared due when the Association failed to make an installment payment on its conditional sales contract. The suit was compromised and dismissed January 17, 1942, upon payment by the Association of $2,600 and the execution of a chattel mortgage by the Association. Rathke Co. in turn promised to remedy certain defects in the equipment sold to the Association. The purchase and sales agreements were extended for one year beyond their original expiration dates.

A large sum of money is required to finance a grape-processing season on a profitable scale. The containers and supplies have to be purchased in advance, and the growers have to be paid a certain amount upon delivery of their grapes to the plant, so that they in turn can pay their laborers. With Rathke Co. having a chattel mortgage on the equipment, the Association was unable to obtain a loan from the bank to finance the 1942 operation.

In the summer of 1942, manager Evans contacted Randall S. Pratt, president of Goebel-Pratt Co., a Washington corporation, engaged in the food brokerage business, in an endeavor to have the last-named company sell fifty per cent of the 1942 grape pack on a brokerage basis, and to aid the Association in financing the 1942 pack. The Goebel-Pratt Co., as stated by Mr. Pratt, "shied away" from the proposition of financing the Association, but did agree to sell fifty per cent of the 1942 pack, on a brokerage basis.

As the result of some assistance from Rathke Co. and the ability of the Association to obtain some supplies on credit, the Association in 1942 processed a small pack of 197 tons of grapes. Most of this was processed into frozen pulp. There was a total of 4,500 gallons of grape juice produced, which was sold to Safeway. Apparently Goebel-Pratt Co. sold half the pack on a brokerage basis, and Rathke Co. sold

half. The portion of the 1942 pack sold by Rathke Co. was sold outside of the state, probably to the New York market. Rathke Co. was paid a brokerage of eight per cent on half the tonnage, and in addition a bonus of two and one-half per cent. Mr. Evans explained the brokerage of eight per cent as being made of five per cent plus three per cent for an outside broker, as provided for in the contract.

In the early part of 1943, Evans called upon Mr. Pratt for assistance. Mr. Pratt, being aware of the contracts the Association had with Rathke Co. and Donelson Co., was not willing to do anything for the Association, but suggested that Evans see an attorney. Apparently as a result of advice received from this attorney and further contacts with Mr. Pratt, Evans persuaded respondent Goebel-Pratt Co. to lease the Association's plant, for which purpose Goebel-Pratt Co. organized respondent Yakima County Processors, Inc. (hereinafter referred to as Processors). Respondent G. Franklin Jones, Mrs. Patricia M. Calvert, and respondent Randall S. Pratt each had a one-third interest in Processors.

On September 20, 1943, the Association leased its Grandview plant to Processors, and also entered into an agreement with Processors concerning the purchase of grapes and the sale of the manufactured product. Rathke Co. was first informed that the Association had leased its plant by a letter written to it by Evans on October 5, 1943. .

On April 30, 1945, the Donelson Co. contract (sales agreement) was assigned to Rathke Co.

■ As previously stated, respondents' defense, that the Donelson Co. contract is illegal and void under the provisions of the Robinson-Patman Act, was raised for the first time in the argument after the conclusion of the testimony. Appellants contend that the defense of illegality, to be available to respondents, must have been pleaded affirmatively, and cite and quote from *Wolfe v. Philippine Inv. Co.*, 175 Wash. 165, 27 P. (2d) 132. It may be admitted that, in the cited case, we stated that the appellant, who raised the question of the invalidity of the contract there involved, was not entitled to introduce evidence upon the matter, as

he had not affirmatively pleaded such illegality. However, it is apparent from the opinion that, if the illegality of that contract had appeared from the evidence introduced by the respondent, who was contending for the validity of the contract, the above rule announced as to appellant would not have been applicable. We also held that Rem. Rev. Stat., § 7077, was not applicable to the facts in the cited case. The *Wolfe* case cites *Maitland v. Zanga*, 14 Wash. 92, 44 Pac. 117, and *Vittucci Co. v. Canadian Pac. R. Co.*, 102 Wash. 686, 174 Pac. 981.

The opinion in *Maitland v. Zanga, supra,* was written by Judge Dunbar, and the rule therein announced is apparently the basis for the rule announced in the *Wolfe* and *Vittucci* cases, *supra.*

The *Maitland* case, *supra,* was an action for damages, founded on an agreement to convey land. The particular question with which we are here concerned was raised in that case by the appellant, Maitland, who claimed the court erred in giving the following instruction:

" 'You are further instructed, gentlemen of the jury, that if you find from the evidence in this case that this contract or receipt was executed in pursuance of a contract that was entered into prior to the time of the defendant making his final proof upon this piece of land, and that he entered into a contract at that time to furnish him with supplies and money, and that this receipt was a part of and grew out of that contract, then you will find for the defendant, for such contract was void.' "

The opinion states:

"This instruction was duly excepted to by the appellant, for the reason that no issue was made by the pleadings that would justify such an instruction; that there was no allegation in the answer that the contract was made in violation of public policy or of the public laws. It is contended, however, by the respondent, that proof of the illegality of a contract may be admitted whether it is pleaded or not, and of course, if it were competent to admit testimony, it would be competent for the court to instruct upon its effect."

We quote further from the opinion:

"But, while it is true that the courts will not enforce illegal contracts, the fact that such contract is illegal must

be determined like any other fact, and to be fairly determined it must be made an issue by the pleadings, or be determined by the *admission of the plaintiff or by testimony* which, in the language of the supreme court of the United States, 'must necessarily prove the illegality of the contract,' as in the instance cited by the court, or where some public record was introduced which could not be disputed.

"If, as in *Oscanyan v. Arms Co.*, 103 U. S. 261, the plaintiff sees fit, either by admissions of his attorney or by his own direct testimony, to bring to the notice of the court the accepted fact that the contract sued upon was an illegal one, of course he cannot be heard to complain that the question of the illegality of the contract was not raised by the pleadings, and that he has had no notice of such an issue in the cause, for he has seen fit to put the question in issue without notice." (Italics ours.)

From the cited cases, it may fairly be concluded that a defendant must plead affirmatively the illegality of a contract upon which suit is brought before he will be permitted to introduce evidence to establish such illegality. This, however, does not mean that, if a contract is illegal on its face, or if a plaintiff, by his evidence, brings to the notice of the court that the contract sued upon is illegal, the court cannot dispose of the case by dismissing the action.

Appellants also quote from 17 C. J. S. 1195, § 559, as follows:

"Evidence tending to show the illegality of the contract in suit cannot be given under a general denial or the general issue, if the contract is valid on its face, but that the defense must be specifically pleaded, at least in the absence of anything in the complaint or petition disclosing illegality."

We continue the quotation where appellants left off:

"In some cases it has been held that if the invalidity of the contract is because of its contravention of a public statute intended for the protection of the parties, and the benefit of which may be waived, the defense of invalidity is not available under a general denial, but must be pleaded; but that where the general public is affected by a violation of the particular statute or the provisions of any public law,

it is not necessarily essential to plead the illegality of a contract constituting such a violation."

Respondents contend that the rule is that,

". . . when a contract is relied upon by a plaintiff and it appears either upon its face or from facts admitted or proven at the trial that it is an illegal contract it will not be enforced, that it matters not hòw its illegality is brought to the attention of the court and a plea of illegality is not necessary [citing *Reed v. Johnson*, 27 Wash. 42, 67 Pac. 381, 57 L. R. A. 404; *Lewer v. Cornelius*, 72 Wash. 124, 129 Pac. 911; *Williams v. Great Northern R. Co.*, 108 Wash. 344, 184 Pac. 340; and *Wright v. Corbin*, 190 Wash. 260, 67 P. (2d) 868]."

In the *Reed* case, *supra*, the opinion states:

"The respondents by their cross complaint were asking for a specific performance of the contract, by decreeing a conveyance to them of the lands claimed by them under their contract. Before they are entitled to the *relief of specific performance, it must appear that the contract which they seek to enforce has all the elements of an enforceable contract*. If the contract is illegal and void for reasons of public policy, specific performance will not be enforced.

" 'Equity will not assume jurisdiction to compel the specific performance of a contract that is illegal in any of its features. If the nature of the contract is such that its enforcement would be in violation of public policy, specific performance will not be granted. The least taint of illegality or want of equity will preclude a decree.' 22 Am. & Eng. Enc. Law, p. 1014, par. 4. . . .

"It cannot be successfully urged that appellants have waived objection to the illegality of this contract by not specially pleading the same. The nonenforcement of illegal contracts is a matter of common public interest, and a party to such contract cannot waive his right to set up the defense of illegality in an action thereon by the other party. It is not necessary to specially plead the defense of illegality, but, when the same is made to appear to the court *at any stage of the case*, it becomes the duty of the court to refuse to entertain the action." (Italics ours.)

While *Maitland v. Zanga*, *supra*, is not cited in the *Reed* case, the latter case does cite *Oscanyan v. Arms Co.*, 103 U. S. 261, 26 L. Ed. 539, also cited in the *Maitland* case.

We shall not set out the facts in *Lewer v. Cornelius, supra,* for the reason that we think the following statement found in the opinion sufficiently explains the situation presented:

"A court will not knowingly aid in the furtherance of an illegal transaction. And in harmony with this principle, it does not concern itself as to the manner in which the illegality of a matter before it is brought to its attention. If such illegality appears in the pleadings of either party, it will not inquire into the technical accuracy of such pleading; if it appears in the statement of witnesses at the trial, it will not inquire into the technical admissibility of such statement as evidence, but will, in either case, start an inquiry of its own, and if it be found that the differences which it is called upon to adjudicate *arise out of an illegal transaction it will leave the parties where it found them,* to work out their differences as best they may." (Italics ours.)

In *Williams v. Great Northern R. Co., supra,* we stated:

"The real question here is something more than a question of *ultra vires* as a question of fact. The company was not required to plead in its answer that it intended to rely upon this statute rendering the contract void as a contract of permanent employment. The contract being void and unenforceable as a contract of permanent employment, and it being so determinable as a matter of law from the face of the contract without the determination of any issue of fact, the company was privileged to invoke such invalidity as a defense without specifically pleading it. The decision of this court in *Reed v. Johnson,* 27 Wash. 42, 67 Pac. 381, 57 L. R. A. 404, is in harmony with and lends support to this conclusion."

In *Wright v. Corbin, supra,* we stated:

"The contention of respondent, in his brief on his motion to dismiss the appeal, that this question [illegality of contract between respondent and appellant] was never raised nor presented to the lower court by appellant, is untenable. *Such a question can be raised at any time and at any stage of the case,* when it has been made to appear that a contract is illegal and unenforceable. *Reed v. Johnson,* 27 Wash. 42, 67 Pac. 381, 57 L. R. A. 404; 13 C. J. 507, § 455." (Italics ours.)

In 12 Am. Jur. 741 *et seq.*, § 223, will be found a discussion of the question here being considered. We quote only the following paragraph:

"But according to the weight of authority, the illegality of an agreement is available as a defense even though it is not pleaded. This is especially so where the agreement is contra bonus mores. [Citing, among other authority, *Reed v. Johnson, supra.*]"

Without attempting to distinguish the cases decided by this court and hereinbefore discussed, we are of the opinion that, under the rules announced in *Reed v. Johnson, supra,* and the other cases cited by respondent, and under the rules announced in 12 Am. Jur., § 223, *supra,* if the grape juice contract (sales agreement) entered into between respondent Association and appellant Donelson Co. shows on its face that it is illegal and in violation of the Robinson-Patman Act, or if the illegality of such contract clearly appears from the contract and appellant's evidence, the trial court was justified in dismissing the action on that ground, notwithstanding that respondent had not pleaded the illegality of such contract.

We come then to the main question in the case, which is whether the trial court, in the light of the evidence, was justified in holding that the Donelson Co. contract was an illegal contract, under the provisions of the Robinson-Patman Act, 15 U.S.C.A., § 13, subd. (c), which reads:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

The Robinson-Patman Act of June 19, 1936, was an amendment of the Clayton Anti-Trust Act of October 15,

1914, 38 Stat. 730. Section 2 of the Clayton Act, which was the section amended, merely forbade discrimination in price, when the effect of such discrimination was to substantially lessen competition or tend to create monopoly. The Robinson-Patman Act broadened the scope of this provision, conferred upon the Federal trade commission power to establish quantity differentials for the purpose of determining discrimination, and cast the burden of proof upon one charged with discrimination to justify any discrimination shown.

Section 13 of 15 U.S.C.A., *supra*, contains subds. (a), (b), (c), (d), (e), and (f).

A brief discussion of § 13, contained in *Great Atlantic & Pac. Tea Co. v. Federal Trade Commission,* 106 F. (2d) 667, is, we think, helpful to a clearer understanding of the over-all purpose of the act. We quote:

"Paragraph (a) deals with the selection of customers and provides that it shall be unlawful to discriminate in price between them. Then follow the cost differential provisos upon which the petitioner relies. Paragraph (b) provides that the burden of rebutting a prima facie case of discrimination rests upon the person charged with a violation of the Section. Paragraph (c) prohibits the payment or acceptance of commission or brokerage or other compensation, except for services rendered, as we have indicated. Paragraph (d) provides that it shall be unlawful to pay or contract for the payment of anything of value for services or facilities unless such payment or consideration is available on proportionally equal terms to all other customers competing in distribution of such products or commodities. Paragraph (e) prohibits the furnishing of services or facilities for processing or handling upon terms not accorded to all purchasers on proportionally equal terms. Paragraph (f) prohibits persons from knowingly receiving a discrimination in price prohibited by Section 13."

It is clear that the above acts are forbidden as unfair trade practices, because "of their tendency to lessen competition and create monopoly, without regard to their effect in a particular case." *Great Atlantic & Pac. Tea Co. v. Federal Trade Commission, supra.*

It is stated in *Biddle Purchasing Co. v. Federal Trade Commission*, 96 F. (2d) 687, 692:

"One of the main objectives of section 2 (c) [15 U.S.C.A., § 13 (c)] was to force price discriminations out into the open where they would be subject to the scrutiny of those interested, particularly competing buyers. . . .

"Section 2 (c) was clearly intended to restore equality of opportunity in business by strengthening the anti-trust laws through protecting trade and commerce against unfair practices and unlawful price discrimination."

 The act here under consideration is applicable only to transactions affecting interstate commerce. *Body-Steffner Co. v. Flotill Products*, 63 Cal. App. (2d) 555, 147 P. (2d) 84.

There is no question but that it clearly appears from the testimony of Mr. Rathke that the products of the grape juice plant sold by Donelson Co. would be sold to buyers outside of the state of Washington. We quote from Mr. Rathke's testimony:

"Q. Mr. Rathke, I think you said that the demand for the product you expected to receive from the Grape Growers was in excess of the supply? A. It was. Q. Now, where is this product sold, the pulp and the juice, that would have been purchased from the Grape Growers? A. Our market would have been the Middle West, the New York market in the New York area, and the California market. Q. Would any part of it have been resold in the state of Washington? A. There might have been a limited amount, but our large market was outside the state of Washington. Q. A very insubstantial amount, then, would be sold in Washington? A. With the exception of the juice. . . . Q. But had you received any in 1941 and what you did receive in 1942, that was sold into foreign markets? A. That would have gone to the New York market. Q. Most of it to the New York market? A. Yes, we had one customer who would have taken the output. Q. I see. And what did you receive in 1942 was sold outside of the state? A. Yes."

In determining whether the sales agreement is a contract to pay brokerage to a buyer in violation of the Robinson-Patman Act, we must, of course, look to the provisions of the sales agreement. We have hereinbefore set out quite

fully the provisions of this contract, and we will not again set it out, but we desire to call special attention to paragraphs Nos. 2, 3, 5, and 6, and particularly to paragraphs Nos. 7, 7a, 7b, and 7c.

Appellants state in their brief:

"Moreover, here in any event appellants were brokers or agents rather than purchasers. The transaction was a marketing agency rather than a sale."

We think this contention is not in accord with the testimony of Mr. Rathke, which is to the effect that he was both a purchaser and a broker under the contract. We again quote from Mr. Rathke's testimony:

"Q. In your contract, sales agreement, with reference to the juice, which is Plaintiffs' exhibit 2, that contract in effect provides for, first, the obligation of the Grape Growers Association to hold for and sell to you up to fifty per cent of their pack, the prices to be determined by a formula in the contract. Is that your understanding? A. That would be my understanding. Q. So, as far as that part of it is concerned, you would then be a purchaser of their manufactured product, would you not? A. We could either be that or we could sell it for their account, as I understand the contract. Q. But, the first part with reference to the fifty per cent, it is their agreement to sell to you— A. That's correct. Q. —such as you required? A. That's correct. Q. So, in that case, you would then be a purchaser of that part? A. Correct. Q. In addition to that, there was also the provision that, if they requested it, you could secure orders for any portion of the remaining fifty per cent and, if they accepted those orders, they would be on a brokerage basis? A. Correct."

As Mr. Rathke testified, and as the sales agreement states, Donelson Co. had the right to purchase up to fifty per cent of the Association's production of grape juice and other products, and, under the contract, the Association would be required to sell Donelson Co. that amount. The contract very carefully distinguishes between the right to brokerage and the right to purchase the products. While Donelson Co. reserves the right to brokerage the products and receive brokerage commissions, the contract states:

"(7b) . . . Such sales shall not be charged against Second Party's fifty percent (50%) allotment as provided in paragraph two (2) above."

While the contract provides that Donelson Co. may act as a broker, it also provides that it may act as a purchaser for fifty per cent of the manufactured products. In respect to that fifty per cent, it would be a purchaser for its own account. In selling such goods to others under its own brand name, for which the contract makes provision, it would not be selling such goods for the Association, from whom it purchased them, but for itself. Donelson Co., in competing with other wholesalers, would set its own price. With the broker's discounts and advertising allowances which it would receive under the sales agreement, Donelson Co. could afford to undersell other purchasers from the Association, and thus engage in unfair trade practices, which, in our opinion, are the very evils sought to be remedied by the Robinson-Patman Act.

Appellants cite *Irwin v. Pacific Fruit & Produce Co.*, 188 Wash. 572, 63 P. (2d) 382, and *Body-Steffner Co. v. Flotill Products, supra*, in support of their contention that under the contract they were brokers and not purchasers. We are unable to see that the cited cases are applicable in the instant case. In the *Irwin* case, the court held the contract was one of consignment and not of purchase. This construction was undoubtedly placed upon the contract for the following reason, as stated in the opinion:

"The contract was written upon a printed form so prepared that it could be filled out to accomplish either a contract of purchase or one of handling only. In the line left blank for the word which should designate the class of contract to be executed, plainly appears the written word 'handle.' This, of course, indicates that the contract was one of consignment and not of purchase."

In the *Body-Steffner Co.* case, the plaintiff received judgment on the theory that all six contracts involved were contracts of purchase and sale. The defendant contended that the contracts were in fact contracts of brokerage or agency. In support of this defense, the defendant at-

tempted to show, by the cross-examination of plaintiff's witnesses and by examination of its own witnesses, that in the trade this standard form of contract was always construed as a contract of agency and not one of sale where a provision for brokerage was inserted in the contract. Objection was sustained to all the questions and offer of proof. The court stated: "In sustaining such objections we are convinced that the trial court committed prejudicial error."

No such situation is presented in the instant case.

█ It is our opinion there is no ambiguity in the contract here under consideration. Donelson Co. was given the right to purchase fifty per cent of the pack, and also the right to brokerage whatever they were able to, the contract not specifying any definite amount. We are of the opinion that, under the plain terms of the contract, Donelson Co., *as buyer*, was given a brokerage.

We are also of the opinion that the Robinson-Patman Act (15 U.S.C.A., § 13 (c)) absolutely prohibits and forbids the paying, or granting, or receiving, or accepting anything of value as a commission, brokerage or other compensation, or any allowance or discount in lieu thereof, from seller to buyer. *Oliver Bros. v. Federal Trade Commission,* 102 F. (2d) 763; *Great Atlantic & Pac. Tea Co. v. Federal Trade Commission, supra; Jarrett v. Pittsburgh Plate Glass Co.,* 131 F. (2d) 674. We quote from the last-cited case:

"It [Robinson-Patman amendment of the Clayton Anti-Trust Act, 15 U.S.C.A., § 13 (c)] prohibited receipt or payment of commissions or discounts in lieu thereof in sales transactions except for services rendered."

See, also, *Southgate Brokerage Co. v. Federal Trade Commission,* 150 F. (2d) 607, from which we quote:

"It is perfectly clear that this provision [Robinson-Patman Act, 15 U.S.C.A., § 13 (c)] forbids the payment of brokerage on a sale or purchase of goods to the other party to the transaction. The seller may not pay the buyer brokerage on the latter's purchases for his own account. As said in the Report of the House and Senate Conference Committee with reference to this subsection (House Rep. 2951, 74th Cong. 2nd Sess.): 'This subsection permits the pay-

ment of compensation by a seller to his *broker or agent* for services actually rendered in his behalf; likewise by a buyer to his *broker or agent* for services in connection with the purchase of goods actually rendered in his behalf; but it prohibits the direct or indirect payment of brokerage except for such services rendered. It prohibits its allowance by the buyer direct to the seller, or by the seller direct to the buyer.' " (Italics ours.)

See, also, *Merchants Service Corp. v. Libby, McNeill & Libby,* 314 Ill. App. 121, 40 N. E. (2d) 835.

■ Appellants contend that the Robinson-Patman Act is a penal criminal statute, and that nowhere therein is there any provision, which Congress could well have included if it so desired, that a contract in violation thereof is illegal, void, and unenforcible. Appellants argue that the courts have repeatedly held that violation of the Robinson-Patman Act is not available as a defense in an action based on the contract in a state court, citing and quoting extensively from *Bruce's Juices v. American Can Co.,* 330 U. S. 743, 91 L. Ed. 1219, 67 S. Ct. 1015, wherein the United States supreme court affirmed the decision of the supreme court of Florida (155 Fla. 877, 22 So. (2d) 461). We are of the opinion the cited case is easily distinguished from the instant case.

The cited case was an action brought by the American Can Co. against Bruce's Juices, Inc., on renewal notes representing the purchase price of goods sold and delivered. The question presented was whether renewal notes representing the purchase price of goods sold and delivered are uncollectible, if it be found that the vendor violated the Robinson-Patman Act. The United States supreme court held that while the act prescribes sanctions, it does not make uncollectibility of the purchase price one of them.

As the trial court in the instant case points out, there is a great difference between an action at law to recover on promissory notes and an action in equity to specifically enforce an illegal contract. The trial court in the instant case, in its memorandum opinion, quoted from the *Bruce's Juices* case:

"None the less, we are urged to supply judicially the sanction of invalidating obligations to pay for goods sold and delivered because, it is said, otherwise the courts become parties to the enforcement of a discrimination. If, in order to prove his own case, a plaintiff proves his violation of law, *then no court will aid the plaintiff to recover.*" (Italics ours.)

Under note 4 is cited *McMullen v. Hoffman,* 174 U. S. 639, 43 L. Ed. 1117, 19 S. Ct. 839, wherein the court refused to enforce a partnership contract which was based on an illegal and fraudulent agreement to submit collusive bids for public construction.

In view of the authority hereinbefore cited, to the effect that a contract to pay a commission, or brokerage, or other compensation in violation of 15 U.S.C.A., § 13 (c), is illegal and unenforcible, we do not deem it necessary to discuss other cases cited by appellants on this point.

We do, however, desire to quote the following statement found in 149 A. L. R. 677:

"A contractual promise to pay a commission or brokerage or other compensation in violation of subsection (c) is illegal and void. Neither the promisor nor the promisee is bound. The rule applies to contracts existing, but not yet performed, on the date when the Robinson-Patman Act went into effect. [Citing authority heretofore set out in this opinion.]"

The sales contract here under consideration is, in our opinion, illegal and void, and unenforcible in the instant case.

Appellants contend that the Robinson-Patman Act has no application to the purchase agreement entered into between the Association and Rathke Co. to buy machinery and supplies; that this agreement is separate, distinct, and independent of the sales agreement. Appellants further contend that the Association is clearly obligated to purchase its additional machinery, equipment, and supplies from appellant Rathke Co., irrespective of the enforcibility of the sales agreement.

An examination of the two contracts will show that the one is dependent on the other. The sales agreement states that

"Whereas, First Party has, by a separate and independent agreement, arranged to obtain certain equipment for said grape juice plant from Clark E. Rathke, doing business as Rathke and Company, and in said written agreement it is provided that First Party herein shall enter into *this agreement* as a part of the consideration for Clark E. Rathke, executing said written agreement to furnish said equipment." (Italics ours.)

It seems to us that if the sales agreement is illegal and void and cannot be enforced, there is a failure of consideration of the purchase agreement.

■ The general rule in regard to illegality of consideration and its effect upon a contract is stated in *Remington Rand, Inc. v. International Business Mach. Corp.,* 167 Misc. 108, 3 N. Y. S. (2d) 515, 523, as follows:

"It is well settled that a contract wholly based on an illegal consideration is wholly unenforcible. At times, however, a contract may be divisible by reason of its containing both legal and illegal provisions. A separation of the two will be attempted by the courts in a proper case, but where the illegality pervades the entire agreement, the courts will abstain from such separation and refuse affirmative relief. *Saratoga County Bank v. King,* 44 N. Y. 87; *Arnot v. Pittston & Elmira Coal Co.,* 68 N. Y. 558, 23 Am. Rep. 190; *Manson v. Curtis,* 223 N. Y. 313, 119 N. E. 559, Ann. Cas. 1918E, 247."

■ We are of the opinion that, the sales agreement being illegal and unenforcible, the purchase agreement for the machinery and supplies, which is dependent upon it, is also unenforcible.

For the reasons herein stated, the judgment of the trial court is affirmed.

MALLERY, C. J., BEALS, STEINERT, and SIMPSON, JJ., concur.

---

May 24, 1948. Petition for rehearing denied.