## City of Burlington v. Mountain Cable Company

[559 A.2d 153]

No. 87-156

Present: **Allen, C.J., Peck, Gibson and Mahady, JJ., and Keyser, J. (Ret.), Specially Assigned**

Opinion Filed November 10, 1988

Motions for Reargument Denied February 16, 1989

*John L. Franco, Jr., Assistant City Attorney*, Burlington, for Plaintiff-Appellant.

*Leo A. Bisson, Jr.*, of *Downs Rachlin & Martin*, St. Johnsbury, for Defendant-Appellee.

*William E. Wargo, City Attorney*, Winooski, for Proposed-Intervenor Cross-Appellant.

**Allen, C.J.** The City of Burlington (City) appeals from the denial of its motion to enjoin Mountain Cable Company (Mountain) from increasing its basic cable television service rates prior to December 29, 1987. We affirm.

In June of 1985, the City and Mountain entered into a contract regarding the provision of cable television service to Burlington residents. Under the terms of the agreement, the City withdrew its objections then pending before the Public Service Board to the reconstruction of the cable system by Mountain, withdrew its opposition to the sale of the franchise rights of Mountain's predecessor to Mountain and agreed to give its active support to the reconstruction of the system by Mountain. It further agreed to withdraw its application for a certificate from the Public Service Board to operate a municipal television system, to forbear from seeking such a certificate in the future, and to drop all claims to the franchise rights being transferred from Mountain's predecessor to Mountain. The parties agreed that the contract constituted a settlement and compromise of all pending matters between the City, Mountain, and Mountain's predecessor. Pursuant to the settlement, litigation then pending between the parties was dismissed and objections by the City to proposed actions by Mountain then pending before the Public Service Board were withdrawn.

The instant dispute arose over the construction of a provision in the agreement which limits Mountain's right to raise rates for

basic cable service in the City. Mountain informed the City of its intention to raise the basic cable rates as of January 1, 1987. The City then instituted this action seeking to prohibit the increase, contending that under the agreement Mountain could not raise its basic rates until December 29, 1987.

At the hearing on the motion for preliminary and permanent injunction, the trial court, sua sponte, questioned whether the paragraph in dispute had been preempted by the Cable Television Communications Policy Act of 1984 (Act). In a subsequent decision the trial court concluded that the attempt to regulate rates was illegal and denied the motion for a preliminary injunction.

On appeal, the City argues that the Act does not preclude enforcement of the contract because it only prohibits rate regulation by franchising authorities, and the State, rather than the City, is the franchising authority.

We note at the outset that the issue of illegality was not pleaded or raised by Mountain, and that Mountain neither briefed nor argued this issue at hearing or in this Court.[1] Courts, however, are not at liberty to ignore illegal provisions in contracts even though the parties have agreed not to contest the contract on grounds of illegality. While, normally, illegality must be pleaded, V.R.C.P. 8(c), if of a serious nature, a court of its own motion will take notice of it and deny relief. See *Vermont Department of Public Service* v. *Massachusetts Municipal Wholesale Electric Co.*, 151 Vt. 73, 91, 558 A.2d 215, 225 (1988); see also *Rathke* v. *Yakima Valley Grape Growers Ass'n*, 30 Wash. 2d 486, 192 P.2d 349 (1948) (trial court justified in dismissing action where sales agreement on its face was illegal and in violation of federal statute).

The Act was promulgated with an effective date of October 30, 1984. Its purposes were, inter alia, to:

> (1) establish a national policy concerning cable communications;

> . . . .

---

[1] The parties to the contract agreed not to initiate any collateral attack on the contract or any of its provisions by any action in any court or tribunal. Presumably, Mountain's failure to claim illegality as a defense was to avoid being in breach of this portion of its agreement.

(3) establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems;

. . . .

(6) promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems.

47 U.S.C. § 521.

With respect to rate regulation the Act provides:

(a) Any Federal agency or State may not regulate the rates for the provision of cable service except to the extent provided under this section. Any franchising authority may regulate the rates for the provision of cable service, or any other communications service provided over a cable system to cable subscribers, but only to the extent provided under this section.

. . . .

(c) In the case of any cable system for which a franchise has been granted on or before the effective date of this title, until the end of the 2-year period beginning on such effective date, the franchising authority may, to the extent provided in a franchise —

(1) regulate the rates for the provision of basic cable service, including multiple tiers of basic cable service;

(2) require the provision of any service tier provided without charge (disregarding any installation or rental charge for equipment necessary for receipt of such tier); or

(3) regulate rates for the initial installation or the rental of 1 set of the minimum equipment which is necessary for the subscriber's receipt of basic cable service.

47 U.S.C. § 543.

A "State" under the Act "means any State, or political subdivision, or agency thereof." 47 U.S.C. § 522(15). The City is such a subdivision and may not regulate except as authorized by the

Act. The exceptions are limited, and it is not claimed that any apply to the facts of this case.

The City's argument that the Act prohibits only "franchising authorities" from rate regulation overlooks the plain language of the Act, which prohibits rate regulation by a political subdivision. The language in the disputed paragraph of the contract regulates the rates which Mountain may charge during the term of the contract. It prohibits any increase by more than the greater of: i) 5%, ii) the annual rate of inflation in Burlington, or iii) the annual percentage of increase in Mountain's costs. That the regulation is contained in a contract for good and valuable considerations is immaterial.[2] The attempt to enforce the provisions of the paragraph is an attempt to regulate, and this the Act forbids.

The City argues that the legislative history of the Act supports its argument that it is intended only to prohibit the regulation of subscription rates by franchising authorities. 1984 U.S. Code & Admin. News 4702-4705. That portion of the history to which our attention is directed simply indicates that the section dealing with regulation of rates is intended to establish a uniform policy of regulation where regulation is still permitted by franchising authorities. It does not suggest that the prohibition against basic rate regulation is directed against franchising authorities only.

The legislative history and the language of the Act evidence the declared policy of Congress to prohibit local governments from regulating basic cable rates after two years from the effective date of the Act. Refusal to enforce an agreement permitting rate regulation is consistent with and essential to effectuate this policy. Enforcement would offend one of the essential purposes of the Act. See *United States* v. *Mississippi Valley Generating Co.*, 364 U.S. 520, 563 (1961). A term of an agreement is unenforceable if the interest in its enforcement is clearly outweighed by a public policy against the enforcement. See *id.* Here, the stated policy is clear and unequivocal, and the enforcement of the contract provision would undermine and detract from that policy.

■ Even were we to accept the City's argument that the Act forbids rate regulation only by franchising authorities, the result would not change. A "franchising authority" as defined in the Act is "any governmental entity empowered by Federal, State, or lo-

---

[2] The City concedes that, in exercising its constitutional powers, Congress may impair obligations arising under contracts.

cal law to grant a franchise; . . . ." 47 U.S.C. § 522(9). A "franchise" means an "initial authorization, or renewal thereof . . . issued by a franchising authority, whether such authorization is designated as a franchise, permit, license, resolution, contract, certificate, agreement, or otherwise, which authorizes the construction or operation of a cable system." 47 U.S.C. § 522(8). While the City may be correct in arguing that the Public Service Board is a franchising authority here,[3] the City is also a franchising authority within the meaning of the Act. Congress recognized that in many states there might be more than one franchising authority and clearly intended that any and all would be covered by the provisions of the Act. In the legislative history, it was noted that in several states the franchising process includes approval by a state agency as well as local government. It was intended in such cases that the term "franchising authority" would include the state agencies as well as "any local government body with authority to grant a franchise." 1984 U.S. Code & Admin. News, at 4682. The City's charter empowers it to grant franchises for the use of its streets by a cable company and to charge fees for the erection and maintenance of poles and wires in or under its streets. See 1949, No. 298, § 48. Under the terms of the agreement, Mountain paid — and the City accepted — a sum of money for the use and occupation of its streets "within the meaning of Charter § 48 (XL)" and agreed that the payment was "in lieu of any Franchise Fee that might otherwise be payable . . . ." The agreement further provided for pole attachment agreements, the rentals to be paid therefor, and the burying of cable within the streets of the City. The exaction of a fee in exchange for use of the public streets is a franchise. See *Erie Telecommunications, Inc.* v. *City of Erie*, 659 F. Supp. 580, 597 (W.D. Pa. 1987). The City was a governmental authority empowered by state law to grant a franchise within the meaning of the Act and is therefore a "franchising authority." It may regulate only to the limit of the authority granted in the Act, and the Act clearly preempts any provision of the franchise that is inconsistent with it:

> [A]ny provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of

---

[3] Under the Vermont Cable Television Reform Act of 1988, the Public Service Board is the franchising authority in the state empowered to grant certificates of public good for cable systems. 30 V.S.A. § 502(b).

any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded.

47 U.S.C. § 556(c). Here, the contract was an authorization for the construction and operation of a cable system, and the City was a franchising authority.[4] The contractual provisions regulating rates were contrary to and preempted by the Act and may not be enforced.

In view of our disposition of this matter, we affirm the denial of the City of Winooski's motion to intervene.

*Affirmed.*

---

[4] Because the City was acting in the capacity of a market competitor in obtaining the settlement contract, it now characterizes its rights under the agreement as proprietary rather than regulatory. But the City cannot avoid the Act's clear prohibitions of regulation by arguing that it achieved rate control only through "proprietary" means. Otherwise, governmental subdivisions could use threats of market competition to obtain de facto rate regulation through contractual settlements, thus avoiding the dictates of the Act.