381 F.2d 29
 The INTERPUBLIC GROUP OF COMPANIES, INC., a corporation,
McCann-Erickson, Inc., a corporation, and
Interpublic Inc., a corporation, Appellants,
v.
ON MARK ENGINEERING CO., a corporation, and Security First
National Bank, Appellees.
 No. 20645.
 United States Court of Appeals Ninth Circuit.
 July 26, 1967.
 
 Rodney K. Potter, O'Melveny & Myers, Los Angeles, Cal., for appellant.
 Latham & Watkins, Los Angeles, Cal., Ira M. Price, Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., for appellees.
 Before WASHINGTON,* MERRILL, and ELY, Circuit Judges.
 ELY, Circuit Judge:
 
 
 1
 In this opinion the three appellants, defendants below, will, collectively, be called 'McCann.' Their relationship is set forth in the margin.[1] They were adjudged to be liable in damages for breach of contract. The principal appellee, plaintiff below, will be referred to as 'On Mark.' The other appellee is a national banking association, which, as plaintiff in intervention, seccessfully asserted its claim under an assignment from On Mark. It will be called 'Bank.' The jurisdiction of the District Court rested upon the diverse citizenship of the parties and the requisite amount in controversy. 28 U.S.C. 1332. Our power of review is conferred by the provisions of 28 U.S.C. 1291.
 
 
 2
 The contract in question is evidenced by two written agreements. One is entitled 'Lease Agreement,' and the other is entitled 'Option to Purchase Aircraft.' The two documents were executed concurrently on July 10, 1959, and the District Court determined, pursuant to stipulation, that the two were intended by the parties to be construed together and to 'constitute a single, entire agreement.' The purpose of the writings was to define the rights of On Mark and McCann in connection with an airplane which was the subject of the contract.
 
 
 3
 The background of the written contract is revealed by the testimony, some of which was received over objection. On Mark was engaged, generally, in the business of buying and selling airplanes. McCann desired, for its own use, a plane of the luxurious type, one described by the parties as an executive aircraft. In early 1959, discussions were begun between representatives of McCann and On Mark, the discussions centering upon the acquisition by McCann of an A-26 military aircraft to be remodeled, or converted, by On Mark according to the specifications of McCann. After detailed specifications were supplied, On Mark first quoted a purchase price of $400,000. Later, after the quoted price had been reduced to $385,000, McCann communicated its preference for a lease arrangement, coupled with an option to purchase. To this, On Mark's representative replied, in effect, that there would be no objection 'so long as (his company) was substantially financially rewarded in the same manner as the sale.' Subsequently, On Mark sent a telegram in which it confirmed its offered price of $385,000 and added, 'Will furnish very attractive lease with option to purchase to cover five (5) year period.' When, thereafter, McCann requested a quotation of rentals for a 60-month lease period, On Mark made inquiry of a leasing company concerning formulae. It then informed McCann's representative, orally, that the rental would be $7,747 per month for 60 months and that McCann would be given 'an option purchase price at the end of the lease when the sixty-month rentals had been paid, for $32,950.' There followed the preparation of the two documents which constitute the contract.
 
 
 4
 The lease agreement called for the quoted monthly rental payments of $7,747 for 60 months, a total of $464,820. The rental payments for the first two months and the last three months of the 60-month term were payable with the execution of the lease. The payments thereafter were to commence on a date two months after the delivery of the aircraft 'and monthly thereafter on the day of the month said delivery shall have been made, until three months prior to the end of the term. * * *' On Mark agreed to deliver the aircraft to McCann for flight testing no later than October 14, 1959, and finally to deliver the aircraft no later than October 24, 1959; however, it was provided that On Mark, so long as it applied its best efforts, should not be in default if it should be prevented from delivering the plane on the agreed date by factors beyond its control. Actual delivery to McCann was not accomplished until December 18, 1959, but McCann accepted the plane and retained its possession and operated it until June 28, 1962.
 
 
 5
 Under the terms of the option agreement, McCann might purchase the plane for $32,950 by giving On Mark 15 days' prior written notice of its intention to exercise the option. It was provided that the option should be exercised 'between July 15, 1964 and August 15, 1964.'
 
 
 6
 On February 8, 1960, following the delivery of the plane approximately seven weeks before, On Mark borrowed $375,000 from the Bank, exchanging its promissory note and, as security, a chattel mortgage on the aircraft and an assignment, for the necessary period, of the moneys payable by McCann.
 
 
 7
 From the foregoing, it is seen that, had On Mark delivered the plane to McCann in October, 1959, as originally scheduled, the last monthly rental payment would have been made in July, 1964. This fact becomes relevant in considering that provision of the option agreement specifying that McCann might exercise the option between July 15, 1964 and August 15, 1964.
 
 
 8
 After taking delivery of the plane on December 18, 1959, McCann made the rental payments required by the contract and, as previously noted, used the plane until June 28, 1962. On that day, the aircraft, while being operated by McCann, was involved in an accident. The agreement provided that McCann was obliged to maintain the plane and to keep it in good condition. The agreement also provided that, should the plane be damaged, On Mark should make repairs promptly if it should determine that repair was economically feasible. Insurance against damage to the plane had been procured and maintained by McCann pursuant to the agreement.
 
 
 9
 After the accident, the plane was disassembled and transported to On Mark's plant in California, and On Mark began to make the necessary repairs. It advised McCann that it would complete its work and have the plane available for redelivery on February 22, 1963. Thereafter, McCann, claiming that On Mark had failed to perform its contractual obligations as they pertained to the repair, refused to accept redelivery of the aircraft. There is ample evidence to support the District Court's finding that 'shortly after the occurrence of the accident, without disclosing its intention to On Mark, McCann determined that it would not again take possession of the A-26 aircraft whether or not it was later repaired and also determined to secure another plane for its permanent use in place of the A-26 aircraft leased from On Mark.'
 
 
 10
 As of the time when delivery of the repaired aircraft was attempted, February 23, 1963, only 35 monthly rental payments had been made by McCann, and on May 10, 1963, On Mark instituted suit, seeking recovery of the remaining 25 of the 60 rental payments which were originally contemplated. The Bank intervened, seeking to recover from McCann the payments which had been assigned to it and which McCann had not paid after the accident of July 28, 1962. Thereafter, on June 30, 1964, McCann notified On Mark in writing of its intention to exercise its claimed option to purchase the plane on July 15, 1964, by paying the prescribed option price of $32,950. On Mark replied, in effect, that McCann had violated the terms of the agreement and had forfeited its right to exercise the option.
 
 
 11
 Much of the evidence produced during the trial was directed to the issue of whether or not On Mark had properly and promptly repaired the damaged aircraft. The District Court determined that it had, and the appellants do not here attack that determination.
 
 
 12
 The principal question before us is whether or not McCann had the right, under the circumstances, to exercise the option at the time it sought to do so, which was, according to the express provision of the option agreement, during the period between July 15, 1964 and August 15, 1964. On Mark takes the position, adopted by the District Court, that the option was not exercisable at that time and was not subject to being exercised by McCann until 60 monthly rental payments had been made.
 
 
 13
 McCann vigorously urges that the District Court erred in receiving parol evidence which disclosed the negotiations leading to the written contract. It argues that the District Court was obliged to determine the parties' rights by looking only to the instruments themselves and that the parol evidence was offered for the purpose of varying the terms of the writings. Its receipt, says McCann, constituted a violation of the parol evidence rule. We do not agree. The District Court predicated its admission of the questioned testimony upon its determination that ambiguity within the terms of the contract created necessity for the evidence. Our study of the contract leads us to the conclusion that the court's preliminary ruling in this regard was correct. The parties agreed that the two documents were, in thrir interpretation, to be construed together. The option agreement, considered separately and apart, provided specifically that the option should be exercised between July 15, 1964, and August 15, 1964. On the other hand, the lease agreement specified that the lease was to be 'for a period of sixty months. * * *' It further provided that McCann was to pay 'sixty monthly rental payments. * * *' Of controlling significance in the particular circumstances is the provision in the lease agreement that, in the event of economically repairable damage to the plane, 'this Lease Agreement shall be extended accordingly so that Lessee's possession of said aircraft shall cover sixty full months.' Reading the two instruments together, as the parties agreed to be proper, the provisions clearly calling for the payment of 60 monthly rental payments and for the extension of the lease in the event of repairable damage to its full term of 60 months are inconsistent with the prescribed right to exercise the purchase option during the specified one-month period and McCann's asserted right to exercise it after having paid only 35 monthly rental payments. Disregarding the parol evidence, which clearly supports the construction adopted by the District Court, we are inclined to the belief that the terms of the writings themselves require the interpretation which was made. We are, however, not required to make that holding in view of the inherent conflict and ambiguity within the writings when they are construed, in the language of the stipulation, 'as a single, entire agreement.' Under California law, controlling here, the challenged evidence was admissible. 'When the language used is fairly susceptible to one of two constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties * * *. Where any doubt exists as to the purport of the parties' dealings as expressed in the wording of their contract, the court may look to the circumstances surrounding its execution-- including the object, nature and subject matter of the agreement * * * 'shedding light upon the question of their mutual intention at the time of contracting." Barham v. Barham, 33 Cal.2d 416, 422-423, 202 P.2d 289, 293 (1949). See also, Body-Steffner Co. v. Flotill Products, 63 Cal.App.2d 555, 147 P.2d 84 (1944); Mayers v. Loew's, Inc., 35 Cal.2d 822, 221 P.2d 26 (1950); Parsons v. Bristol Development Co., 62 Cal.2d 861, 44 Cal.Rptr. 767, 402 P.2d 839 (1965).
 
 
 14
 The Supreme Court of California has also said, 'A principle of construction well settled is that where one construction would make a contract unusual and extraordinary, and another construction, equally consistent with the language employed, would make it reasonable, fair, and just, the latter construction must prevail.' Stoddart v. Golden, 179 Cal. 663, 665, 178 P. 707, 708, 3 A.L.R. 1060 (1919). To adopt McCann's argument in the instant case would result in its acquisition of the aircraft for only $304,095, the option price of $32,950 plus $271,145, the total sum of the 35 monthly rental payments which it had made. In our opinion, such a result would not only thwart the parties' intention that McCann, to acquire the plane, should pay the full reasonable value therefor, but it would also violate the concept of essential fairness endorsed by the California court in Stoddart v. Golden, supra. McCann contends that it is unfair that it should be required to expend $497,770,60 months' rental totalling $464,820, plus the option price of $32,950, for a plane worth only $385,000.[2] We cannot see unfairness to McCann in the enforcement of terms to which it agreed. Moreover, it appears that the sum of $497,770 is very nearly equivalent to $385,000 amortized over a 60-month period at interest of only six per cent. It is entirely possible, as suggested by certain evidence,[3] that McCann expected to reap tax advantages by extending payments for the aircraft over a 60-month period, paying more than $385,000 for the plane with substitution of the lease agreement and the option agreement for the outright purchase which was, quite clearly, originally contemplated. We cannot blind ourselves to common business practice, and we have no doubt whatsoever that the writings in question, when construed together, evidence McCann's intent to enter into a purchase agreement under the guise of a long-term lease coupled with the eventual option right exercisable by the payment of a comparatively small remaining sum.
 
 
 15
 In a portion of the judgment of the District Court, McCann was held liable for $10,891.90, the cost incurred by On Mark in maintaining and storing the aircraft after McCann had wrongfully refused to accept redelivery when the damaged plane had been repaired. Under the findings, the award was proper, inasmuch as the maintenance and storage arose from McCann's wrong and, under the terms of the lease, it was required to 'bear all maintenance costs.' Under the contract, it was required to bear these costs during its possession of the plane, but it cannot escape the obligation by refusing possession which it was obliged to take.
 
 
 16
 McCann was also adjudged to be liable for $201,422, an amount representing rental payments which should have been paid under the extended lease from the time when McCann should have accepted the delivery of the repaired aircraft on February 27, 1963, until the expiration of 25 additional months, plus interest on those unpaid rentals. Against the award, McCann contends that it should have been given an offset, or credit, in the sum of $92,050, which, it says, was the difference between the option price of $32,950 and $125,000, its asserted valuation of the plane at the time it sought to exercise the option. The District Court rejected the contention upon the ground that McCann was not entitled to exercise the option at the time it sought to exercise it, and we hold that the conclusion was correct.
 
 
 17
 McCann also attacks that portion of the judgment requiring it to pay directly to the Bank $118,857.10, the remaining portion of the obligation to the Bank under On Mark's assignment. In its brief, however, McCann concedes that 'if On Mark is in fact entitled to $201,422.00, there is no problem presented by this portion of the judgment.'
 
 
 18
 Affirmed.
 
 
 
 *
 Of the District of Columbia Circuit, sitting by designation
 
 
 [1]
 McCann-Erickson Incorporated was incorporated in Delaware in 1930. On December 30, 1960, its name was changed to Interpublic Incorporated, and on January 8, 1964, to The Interpublic Group of Companies, Inc
 The parties agreed that, should a judgment be entered against any one of the named defendants, it should also be entered against the other defendants.
 
 
 [2]
 In advancing this argument, McCann itself seems to resort to certain parol evidence relating to the original price negotiations, evidence which, in another context, it claims to have been improperly received
 
 
 [3]
 There is evidence that, in discussing the form of the transaction, McCann's representative stated 'that it would be better for them (McCann) and it would help them tax-wise if we could do it on a lease basis with an option to purchase.'