T.C. Memo. 1999-200

UNITED STATES TAX COURT

TALLEY INDUSTRIES, INC. AND CONSOLIDATED SUBSIDIARIES,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 27826-92.                    Filed June 18, 1999.

<u>James G. Phillipp</u> and <u>Dora Arash</u>, for petitioner.

<u>Daniel M. Whitley</u> and <u>Bradley T. Stanek</u>, for respondent.

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

FAY, <u>Judge</u>:  This case was assigned to Chief Special Trial
Judge Peter J. Panuthos pursuant to the provisions of section
7443A(b)(4) and Rules 180, 181, and 183.[1]  The Court agrees with

[*]   Supplementing T.C. Memo. 1994-608.

[1]   All section references are to the Internal Revenue Code
                                        (continued...)

and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

PANUTHOS, Chief Special Trial Judge:  This matter is before the Court on remand from the Court of Appeals for the Ninth Circuit. See Talley Indus., Inc. & Consol. Subs. v. Commissioner, 116 F.3d 382 (9th Cir. 1997), revg. and remanding T.C. Memo. 1994-608.  In Talley Indus., Inc. & Consol. Subs. v. Commissioner, T.C. Memo. 1994-608, we granted petitioner's motion for summary judgment in part--holding that petitioner was entitled to a deduction of $2.5 million (less $1,885 which was characterized as a "fine" pursuant to criminal charges) reflecting the amount that petitioner paid to the Government to settle its civil liability for submitting false claims under certain Federal contracts.  The Court of Appeals reversed and remanded the case on the ground that "a genuine issue of material fact exists as to the characterization and the purpose of the $940,000 portion of the settlement."  Talley Indus., Inc. & Consol. Subs. v. Commissioner, 116 F.3d at 387.  The Court of Appeals summarized the matters to be decided on remand as follows:

> If the $940,000 represents compensation to the
> government for its losses, the sum is deductible.  If,
> however, the $940,000 represents a payment of double
> damages [under the False Claims Act], it may not be

---

[1](...continued)
in effect for the year in issue, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure.

deductible.  If the $940,000 represents a payment of double damages, a further genuine issue of fact exists as to whether the parties intended the payment to compensate the government for its losses (deductible) or to punish or deter Talley and Stencel (nondeductible).  [Citation omitted.]

Id.

FINDINGS OF FACT

Stencel Aero Engineering Corp. (Stencel), a wholly owned subsidiary of Talley Industries, Inc. (Talley or petitioner), manufactured ejection seats for military aircraft.  During the early 1980's, Stencel's primary customer was the U.S. Department of the Navy (Navy Department).  Stencel's work for the Navy Department involved both the production of ejection seats and research and development projects (R&D projects).

Stencel's employees generally were required to maintain daily timecards showing the number of hours devoted to specific production contracts or R&D projects.  Stencel used the data from these records to determine its costs under a particular production contract or R&D project, and, in the case of all contracts with the Navy Department, those data were incorporated, directly or indirectly, in the invoices or requests for progress payments that Stencel submitted to the Navy Department.

On December 20, 1984, the Defense Criminal Investigative Service executed a search warrant at Stencel's plant in Arden, North Carolina, and seized certain of Stencel's records, including certain employee timecards.  On March 8, 1985, a

Federal grand jury sitting in the Western District of North Carolina returned a criminal indictment against Stencel and three of its senior employees.  Stencel was charged in the indictment with one count of violating 18 U.S.C. section 287 (filing a false claim for payment with the Federal Government), one count of violating 18 U.S.C. section 286 (conspiracy to file a false claim for payment with the Federal Government), and 42 counts of violating 18 U.S.C. section 1001 (submission of a false claim in writing to an agency of the Federal Government) or 18 U.S.C. section 2 (aiding and abetting in the commission of such an offense).

On May 23, 1985, the Navy Department suspended Talley and Stencel from further Government contract work by placing the two companies on the Consolidated List of Debarred, Suspended and Ineligible Contractors.

On June 12, 1985, Stencel entered into a plea agreement with the Government under which Stencel agreed to plead guilty to 10 counts of making false statements to the Government in violation of 18 U.S.C. section 1001.  In exchange, the Government agreed not to prosecute certain of Stencel's officers and to dismiss the remaining counts against Stencel.  The plea agreement was accepted by the U.S. District Court for the Western District of North Carolina and, on July 8, 1985, the court entered a Judgment and Probation Commitment Order against Stencel.  The Judgment and

Probation Commitment Order stated in pertinent part that Stencel would pay a fine of $100,000 ($10,000 for each of the 10 agreed counts) and that Stencel shall "make full restitution for all losses, to be determined by the U.S. Navy at a later date".

On July 12, 1985, the Navy Department lifted the suspension order against Talley and all of its subsidiaries, with the exception of Stencel. During the time that Stencel remained in suspended status, the Navy Department generally was prohibited from purchasing either new ejection seats or replacement parts for ejection seats from Stencel.

In September 1985, Joyce R. Branda (Ms. Branda), a trial attorney with the Fraud Section, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, was assigned to represent the Government in the Stencel matter. Upon assignment to the case, Ms. Branda received evidence that all four of Stencel's major departments--production, engineering, inspection, and quality assurance--had engaged in labor mischarging, and that mischarging may have occurred as early as 1979.

As a result of the alleged mischarging, Talley and Stencel faced potential civil liability under the False Claims Act (FCA), 31 U.S.C. section 3729 (1982),[2] the Truth in Negotiation Act

_____

[2] At the time of Stencel's indictment, 31 U.S.C. sec. 3729 (1982) provided in pertinent part:

A person not a member of an armed force of the
(continued...)

(TINA), 10 U.S.C. section 2306(f) (1982),[3] and common law

_____

²(...continued)
United States is liable to the United States Government for a civil penalty of $2,000, an amount equal to 2 times the amount of damages the Government sustains because of the act of that person, and costs of the civil action, if the person--

(1) knowingly presents, or causes to be presented, to an officer or employee of the Government or a member of an armed force a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved * * *

³ At the time of Stencel's indictment, 10 U.S.C. sec. 2306(f) (1982) provided in pertinent part:

(1) A prime contractor or any subcontractor shall be required to submit cost or pricing data under the circumstances listed below, and shall be required to certify that, to the best of his knowledge and belief, the cost or pricing data he submitted was accurate, complete and current--

(A) prior to the award of any negotiated prime contract under this title where the price is expected to exceed $500,000; * * *

(2) Any prime contract or change or modification thereto under which such certificate is required shall contain a provision that the price to the Government, including profit or fee, shall be adjusted to exclude any significant sums by which it may be determined by the head of the agency [as defined in section 2302 to include the Secretary of the Navy] that such price was increased because the contractor or any subcontractor required to furnish such a certificate, furnished cost or pricing data which, as of a date agreed upon between the parties (which date shall be as close to the date of agreement on the negotiated price as is practicable), was inaccurate, incomplete, or noncurrent * * *.

contract claims.

Talley and Stencel were represented by, among others, private attorneys William J. Kilberg (Mr. Kilberg) and John Chierichella, and by Mark S. Dickerson, Talley's secretary and general counsel.

During a November 18, 1985, meeting in Asheville, North Carolina, the Government provided Talley and Stencel with a schedule (the Asheville damages schedule) summarizing the Government's estimate of its damages during 1984 attributable to the specific acts of labor mischarging described in the indictment as well as the additional labor mischarging that the Government suspected in Stencel's four major departments. The Asheville damages schedule included an estimate of total damages for 1984 of $205,699 and an estimate of forfeitures under the FCA of $850,000 (425 alleged acts of labor mischarging multiplied by $2,000). The Asheville damages schedule did not include an estimate of the Government's incidental damages, such as the costs associated with the investigation, the suspension and debarment proceedings, the grounding of any Navy aircraft for lack of replacement parts, or the Government's loss of use of funds improperly paid to Stencel.

Although the Government believed that labor mischarging had occurred as early as 1979, neither party examined or analyzed Stencel's billing data or other records for the years 1979 to

1983 to the extent necessary to calculate the Government's actual losses for any of those years.

Because the Navy Department was Stencel's largest customer, and since Stencel was one of only a few companies in the world qualified to produce ejection seats for Navy Department aircraft, the Government and Stencel both recognized the urgency of reaching an agreement sufficient to permit the Navy Department to lift Stencel's suspension.

In November 1985, Ms. Branda offered to settle the Government's claims against Talley and Stencel for $3.6 million. Ms. Branda arrived at the $3.6 million figure by assuming an average of $300,000 in "singles" damages per year for the 6-year period 1979 through 1984 for total "singles" damages of $1.8 million, and then doubling that amount. "Singles" damages is a term of art under the FCA, which provides for an award of double the Government's actual damages.

On or about December 9, 1985, Talley and Stencel countered Ms. Branda's $3.6 million settlement offer by offering to settle the Government's claims for $750,000. Talley and Stencel calculated the Government's total damages for labor mischarging for 1983 and 1984 at $191,899. In addition, although Talley and Stencel denied liability for labor mischarging before 1983, their settlement offer included amounts for alleged labor mischarging in Stencel's production department from 1979 to 1984. Talley and

Stencel arrived at the $750,000 figure by doubling the amount that they believed represented the Government's actual losses.

On December 24, 1985, Walter T. Skallerup, Jr., General Counsel of the Navy, responded as follows to Ms. Branda's request for a recommendation of the minimum settlement value of the Government's claims against Talley and Stencel:

> The investigation leading to the guilty plea focused primarily on evidence of mischarging during 1984. There is reason to believe, however, that mischarging began in 1979 and continued throughout the period from 1979 to 1984. The amount of such mischarging cannot now be quantified. Nevertheless, we believe that any settlement offer should include an amount for the full False Claims Act liability for the provable losses in 1984 and a substantial amount for the possible liability for losses in prior years, or a total of $2.5 million.

On January 7, 1986, Ms. Branda submitted a memorandum to the Assistant Attorney General, Civil Division, in which she proposed to reject the pending $750,000 settlement offer and suggested that the case should be settled in the range of $2 million to $2.5 million. Ms. Branda summarized her position as follows:

> Thus, we think that the singles figure of $1.56 million adequately compensates the government for its losses based upon a fair and defensible projection. We also believe that here, where Stencel has pled guilty to related criminal charges and where civil proceedings have not begun, it is premature to accept only an estimate of our single losses and that assessment of a "penalty" (as a portion of our double damages and/or forfeitures) is appropriate. A settlement of $2 - 2.5 million represents compensation for an estimate of losses, plus assessment of a penalty.

On January 13, 1986, Ms. Branda was given authorization to reject the pending $750,000 settlement offer and to make a counteroffer of $2.5 million.

On January 14, 1986, Talley, Stencel, and the Navy Department executed an interim agreement under which the Navy Department agreed to end Stencel's suspension and Stencel agreed, in turn, to pay the Navy Department $600,000 and to continue negotiating in good faith to settle the potential liability.

By late January 1986, Talley, Stencel, and the Government had agreed to assume, solely for purposes of settlement discussions, that Stencel's labor mischarging had occurred in each of the years 1979 through 1984 at a constant rate in relation to Stencel's direct labor charges for such years. They further agreed that the Navy Department's total losses of the type described in the Asheville damages schedule for 1979 through 1984 were $1,560,000.

By letter dated January 31, 1986, Mr. Kilberg made a new offer to settle the Government's claims against Talley and Stencel for $2 million (with an offset of the $600,000 that Stencel had paid earlier). Mr. Kilberg's letter stated in pertinent part:

> Stencel has offered the United States a total of two million dollars, inclusive of the $600,000 previously paid pursuant to agreement with the Department of the Navy. <u>This sum shall be compensation for any and all restitution and damages that may be owing by Stencel to the United States</u> for any possible

labor mischarging that may have occurred prior to December 20, 1984 and shall release Stencel from any liability to the United States for:

>     (1) any and all possible violations of the False Claims Act * * *;
>
>     (2) any and all possible violations of the Truth in Negotiations Act * * *;
>     [Emphasis added.]

Mr. Kilberg's letter included a third numbered paragraph describing the releases of liability set forth in the first and second numbered paragraphs.  Mr. Kilberg's letter also included a statement that the offer was intended to represent double damages.

By letter dated February 7, 1986, Ms. Branda rejected Mr. Kilberg's $2 million settlement offer but made a counteroffer to settle the matter for $2.5 million (with an offset for the $600,000 that Stencel had already paid under the interim agreement).  Ms. Branda's letter stated in pertinent part:

> Stencel's offer has been carefully considered by this office, the Navy's Office of General Counsel, the Defense Contract Audit Agency, and Defense Contract Administration Services in Atlanta.  <u>While we believe that the offer is made in good faith, we cannot accept its terms.  However, I am prepared to make the following counter offer</u>, subject to final Department approval:
>
>     1. Stencel agrees to pay to the United States the sum of $2,500,000, inclusive of the $600,000 paid to the Navy pursuant to the agreement dated January 14, 1986; [Emphasis added.]

In extending her counteroffer, Ms. Branda expressly adopted the first and second numbered paragraphs in Mr. Kilberg's January 31, 1986, letter (quoted above) and partially adopted and modified the third numbered paragraph therein. Ms. Branda did not specifically characterize the settlement payment, or any part thereof, as either compensation for the Government's losses or as a penalty.

On February 18, 1986, the parties executed a settlement agreement that was consistent with Ms. Branda's February 7, 1986, counteroffer. The settlement agreement provided that Talley and Stencel would pay the Government $1.9 million ($2.5 million less an offset of $600,000), that Talley and Stencel would pay $900,000 upon execution of the agreement, and that Talley and Stencel would pay the remaining $1 million no later than February 18, 1987, with simple interest computed at the rate established by the Secretary of the Treasury pursuant to the Renegotiation Act Amendments, Pub. L. 92-41, sec. 2, 85 Stat. 97 (1971). The settlement agreement provided that Talley and Stencel were relieved of liability under the FCA and the TINA, and that the settlement satisfied Stencel's obligation to provide restitution under the Judgment and Probation Commitment Order entered on July 8, 1985. The settlement agreement did not characterize the payment as either compensation to the Government for its losses or as a penalty.

Talley reported the $2.5 million payment as an ordinary and necessary business expense on its consolidated Federal income tax return for the taxable year 1986.  Upon examining the return, respondent disallowed the deduction and determined a deficiency in petitioner's Federal income tax for 1986 in the amount of $853,042.  Petitioner invoked the Court's jurisdiction by filing a petition for redetermination.  At the time the petition was filed, petitioner's principal place of business was located in Phoenix, Arizona.

OPINION

Section 162(a) provides the general rule that a taxpayer is allowed a deduction for all ordinary and necessary expenses paid or incurred by the taxpayer in carrying on a trade or business.  Section 162(f), however, proscribes a deduction under section 162(a) for "any fine or similar penalty paid to a Government for the violation of any law."  The phrase "fine or similar penalty" is defined in section 1.162-21(b), Income Tax Regs., as follows:

> (b) <u>Definition</u>.  (1) For purposes of this section a fine or similar penalty includes an amount--
>
> (i) Paid pursuant to conviction or a plea of guilty or <u>nolo</u> <u>contendere</u> for a crime (felony or misdemeanor) in a criminal proceeding;
>
> (ii) Paid as a civil penalty imposed by Federal, State, or local law, * * *;
>
> (iii) Paid in settlement of the taxpayer's actual or potential liability for a fine or penalty (civil or criminal);  * * *

Section 1.162-21(b)(2), Income Tax Regs., provides that compensatory damages paid to a Government do not constitute a fine or penalty.

Deductions are a matter of legislative grace, and the taxpayer must show that he comes squarely within the terms of the law conferring the benefit sought. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Welch v. Helvering, 290 U.S. 111, 115 (1933). Applying this principle in the instant case, petitioner bears the burden of proving that, in settling the Stencel matter, the parties intended for the entire $2.5 million payment (including the $940,000 portion of the payment that exceeded the Government's $1.56 million "singles" damages) to represent compensation to the Government for its losses.

The first issue to be resolved is whether the parties intended the Stencel settlement to include double damages under the FCA. Although the settlement agreement does not characterize the $2.5 million payment, or any part thereof, as double damages, we conclude that the parties intended the settlement to include double damages under the FCA. In short, the parties' various offers and counteroffers repeatedly referred to the settlement as including double damages.

Next, we must consider whether the purpose of the $940,000 double damage payment was to compensate the Government for its

losses or to deter or punish Stencel.  The Court of Appeals stated:

> The double damages provision of the FCA has both compensatory and deterrence purposes.  See United States v. McLeod, 721 F.2d 282, 285 (9th Cir. 1983); see also Mortgages, Inc. v. United States Dist. Court, 934 F.2d 209, 213 (9th Cir. 1991); United States v. Northrop Corp., 59 F.3d 953, 965 (9th Cir. 1995). "[T]he double damages provision of the [FCA] is meant not only to compensate the government fully but also to deter fraudulent claims from being filed against it." McLeod, 721 F.2d at 285.  Congress chose the double damage provision "'to make sure that the government would be made completely whole.'"  Id. (quoting United States v. Hess, 317 U.S. 537, 551-52, 63 S.Ct. 379, 388, 87 L.Ed. 443 (1943)).  At the same time, however, the double damage provision "'maximizes the deterrent impact ....'" McLeod, 721 F.2d at 285 (quoting United States v. Bornstein, 423 U.S. 303, 317, 96 S.Ct. 523, 531, 46 L.Ed.2d 514 (1976)).

Talley Indus., Inc. & Consol. Subs. v. Commissioner, 116 F.3d at 387.

The settlement agreement does not characterize the $2.5 million payment, or any portion thereof, as either compensation for the Government's losses or as a penalty.  In light of this ambiguity, the Court of Appeals indicated that the deductibility of the $940,000 amount would have to be resolved by determining the parties' intent.  See id.

Petitioner contends that no portion of the $940,000 in dispute can be considered a penalty because the Government's actual losses--including its incidental losses, such as the costs associated with the investigation, the suspension and debarment proceedings, the grounding of Navy aircraft for lack of

replacement parts, and the Government's loss of use of funds improperly paid to Stencel--exceeded the $2.5 million that petitioner paid under the settlement agreement.  Petitioner further contends that its representatives and attorneys always intended for the entire settlement to represent compensation to the Government for its losses.

Respondent counters that, regardless of the amount of the Government's actual losses, the Government intended that the disputed portion of the settlement payment would serve as a penalty to deter Stencel and other Government contractors from submitting false claims.

The parties present opposing positions respecting the correct characterization of the disputed portion of the settlement payment.  Justice Oliver Wendell Holmes stated that "the making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs,--not on the parties' having meant the same thing, but on their having said the same thing."  Holmes, "The Path of the Law", 10 Harv. L. Rev. 457, 464 (1897).

We reject petitioner's contention that the disputed portion of the settlement agreement cannot be considered a penalty because the Government's actual losses purportedly exceeded the entire $2.5 million settlement payment.  Neither party made a serious effort to quantify the Government's actual losses in

excess of its "singles" damages of $1.56 million.  Moreover, the settlement, by its very nature, reflects a compromise influenced by a number of factors including the hazards of litigation, the need for an expedited settlement, and possibly the character of the payment.  To accept petitioner's position, we would have to ignore evidence that the Government was willing to accept the settlement on the belief that a portion of the settlement in excess of its "singles" damages would amount to a penalty.  It follows that we must proceed to consider the parties' intent, as mandated by the Court of Appeals.  See Talley Indus., Inc. & Consol. Subs. v. Commissioner, 116 F.3d at 387-388.

A settlement agreement is treated like any other contract for purposes of interpretation.  See United Commercial Ins. Serv., Inc. v. Paymaster Corp., 962 F.2d 853, 856 (9th Cir. 1992); see also Saigh v. Commissioner, 26 T.C. 171, 177 (1956); Fisher v. Commissioner, T.C. Memo. 1994-434.  In the case of an ambiguous contract, the Court may consider extrinsic evidence, such as evidence of the parties' prior negotiations and communications, in order to ascertain the parties' intent.  See California Pac. Bank v. SBA, 557 F.2d 218, 222 (9th Cir. 1977); 2 Restatement, Contracts 2d, sec. 214(c) (1981); see also United Commercial Ins. Serv., Inc. v. Paymaster Corp., supra at 856; Interpublic Group of Cos. v. On Mark Engg. Co., 381 F.2d 29, 32-33 (9th Cir. 1967).

The record shows that, in negotiations leading up to the settlement agreement, petitioner took the position that its settlement offer would serve to compensate the Government for its losses. In this regard, Mr. Kilberg's January 31, 1986, letter stated: "This sum shall be compensation for any and all restitution and damages that may be owing by Stencel to the United States for any possible labor mischarging that may have occurred prior to December 20, 1984".

However, Ms. Branda rejected Mr. Kilberg's January 31, 1986, settlement offer. In particular, by letter to Mr. Kilberg dated February 7, 1986, Ms. Branda stated: "While we believe that the offer is made in good faith, we cannot accept its terms." Ms. Branda went on to present a counteroffer in which she expressly adopted specific portions of Mr. Kilberg's earlier offer. Ms. Branda did not adopt Mr. Kilberg's characterization of the settlement payment as compensation. In fact, although Ms. Branda had characterized a portion of the settlement as a penalty in her in-house communications, Ms. Branda did not characterize the settlement payment at all in her counteroffer to Mr. Kilberg.

Petitioner did not clarify the matter. The parties executed a settlement agreement that is silent on the subject of the characterization of the settlement payment.

The Court of Appeals emphasized that petitioner "suffers the consequence" if evidence to establish entitlement to the disputed

deduction is lacking.  <u>Talley Indus., Inc. & Consol. Subs. v. Commissioner</u>, 116 F.3d at 387-388.  The record shows that the parties did not agree whether the portion of the settlement in excess of the Government's "singles" damages would constitute compensation to the Government for its losses or a penalty against Stencel.  It thus follows that petitioner has failed to establish entitlement to a deduction for the disputed portion of the settlement.

Consistent with the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.